STATE

v.

Anthony J. **GARDINER.**

No. 91–626–C.A.

Supreme Court of Rhode Island.

Jan. 31, 1994.

Jeffrey Pine, Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Paula Rosin, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

This case came before this court on the appeal of the defendant, Anthony J. Gardiner (Gardiner), from a Superior Court judgment of conviction on five counts of assault with a dangerous weapon and one count of witness intimidation. In 1990 the trial justice denied the defendant's motion for a new trial and sentenced him to a total of fifteen years in the Adult Correctional Institutions. On appeal the defendant seeks to have this court vacate his conviction and remand to the Superior Court for a new trial. We affirm.

The record of this case is voluminous—nine volumes containing a total of 1,739 numbered pages. Hence, we relate only that précis of relevant facts pertinent to the issues raised on appeal.

It is undisputed that on the night of September 6, 1989, Irene Bassett (Bassett) suffered a brutal attack that multiple perpetrators committed. In her testimony, Bassett referred to four male assailants, one black and three white.

Clad in a pink sweatsuit, Bassett was doing her laundry on the bottom floor of her residence at 35 Lake Street in Warwick when she heard what she thought was her cat crying outside. She checked outside the apartment building twice to see what was happening and to let the cat in, but the crying stopped both times she went out the door. A few minutes later, Bassett heard the crying a third time and stepped outside to investigate.

Suddenly someone on her right side struck her in the head with an object. Two attackers grabbed her, one from each side, and someone slapped tape over her mouth. They shoved her and kneed her in the back, directing her through the grassy yard behind the apartment building and into the woods. Bassett struggled, dragging her feet and trying to halt the movement toward the woods. As they moved across the yard, she noticed that a white arm was holding her on her right side and a dark arm was holding her left side. She heard the attacker to her left, a black man whom she later identified as Gardiner, say such things as "knock her out" and something about shutting her up.

As they crossed the yard, her attackers hit her on the head and the back with the same object with which they had initially struck her, which object she described as a pipe. As they approached the woods, she saw Richard Fines (Fines) facing her, a man whom she knew well; she thought he was a friend

there to help her. Before they reached the edge of the woods, the white-armed man used a long knife to slice her abdomen. Fines turned around and walked into the woods and her two attackers pushed her into the woods behind him.

There, they tried to tape her hands together, but she freed her left arm from Gardiner's grip and grabbed the tape from the white-armed man to throw it. Bassett and the attackers who flanked her struggled for the tape. She did not know where Fines was at that point. Bassett managed to sit on the tape, but the man on her right grabbed and held her while Gardiner taped her wrists together behind her back. During the struggle over the tape, Bassett was able to see the faces of both men. Bassett testified that, when she was lying on her side on the ground as Gardiner taped her arms behind her back, she saw his face for "a few seconds * * * the most thirty seconds." Part of that time, she was located at most a foot away from him.

After her arms were taped, her attackers brought her to her feet and pushed, dragged, and hit her as they had before, directing her deeper into the woods. Bassett further testified that they told her that this would shut her up. At some point much farther into the woods they stopped, and a third assailant taped her feet together. She recognized the man who taped her feet as Frederick Heon (Heon), although he was not a friend as Fines was.

Bassett testified that Gardiner held her down while her feet were being taped and then looked directly at her and said, "I'm going to shut you up, you fucking bitch." She attempted to roll away, but Fines kicked her back, and Gardiner said that he wanted her tongue out. One of the other assailants responded that he was "not going to jail because of this cunt." Then the assailant on her right removed the tape from her mouth and tried to pull out her tongue, whereupon she pulled away and bit him. Someone smacked her in the cheek with the pipe, and one assailant held her tongue while another sliced it, using the same knife with which he had cut her abdomen. When Bassett tried to pull her head away, he sliced her face also.

Meanwhile, Gardiner was still holding her down.

They retaped her mouth and continued hitting her; Gardiner kept urging them to "knock her out." Blood ran down her throat, choking her and making her feel ill and have difficulty breathing. The man to her right then sliced open her shirt and bra, cut her chest, and incised an X across her nipple while Gardiner held her down. Another assailant then bit her nipple and shook his head while doing so. Gardiner held down her legs while the assailant with the knife cut her pants and, she believed, her underwear. Gardiner said something to the effect of "If this doesn't shut you up I'm going to get those little bastard kids." Gardiner was near her feet when another assailant inserted a finger inside her vagina. Bassett testified that she was screaming to whatever extent she could with the tape covering her mouth. When she heard a woman's voice from a distance, her attackers started to flee. She heard the men say "Where's Frankie?" and "Over there." Then someone asked, "What did you do with it?" and someone said, "I threw it." She testified that during the course of the attack, she heard the names Ray or Jay and Rick, and she vaguely recalled hearing Tony.

Some residents of and visitors to Lake Street that night responded to what some thought were the sounds of a crying animal or cats fighting. They went into the woods and found Bassett lying on her side, moaning, with her mouth taped shut and her feet and arms bound by tape. Someone called the police, and Bassett was taken to Kent County Memorial Hospital in an ambulance and treated and released.

A grand jury investigated and ultimately charged defendant and three other men, Heon, Fines, and Edward Kollett (Kollett), in connection with this incident. All four were charged with five counts of assault with a dangerous weapon, one count of witness intimidation, one count of assault resulting in serious bodily injury, one count of assault with intent to murder, one count of kidnapping, and one count of assault and battery. Additionally Heon was charged with first-degree sexual assault for engaging in sexual

penetration of Bassett. Gardiner, Kollett, and Fines were charged with aiding and abetting Heon in the commission of that offense. Prior to trial, the state dismissed the charges of assault and battery and assault with intent to murder pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. The trial justice granted defendant's motion to sever his trial from that of his codefendants.

The defendant's trial then took place over several days. The trial justice granted defendant's motion for judgment of acquittal on the kidnapping charge. Subsequently, the jury convicted defendant of the five counts of assault with a dangerous weapon and witness intimidation; the jury acquitted him of assault resulting in serious bodily injury and aiding and abetting first-degree sexual assault.

On appeal, defendant alleges three areas of error in the trial record. He claims that (1) the trial justice abused his discretion by refusing to permit an expert witness to testify on behalf of defendant regarding eyewitness identification; (2) the trial justice erred by denying defendant's motion to suppress Bassett's in-court and out-of-court identifications; and (3) the trial justice erred by denying defendant's numerous motions to pass the case.

I

■ The defendant argues that the trial justice abused his discretion when he refused to allow an expert witness, Professor Robert Buckhout (Buckhout), to testify on behalf of the defense regarding eyewitness identification. The defendant sought to have Buckhout testify regarding numerous issues and research findings: the effect of stress on perception and recall; the absence of a correlation between confidence in and accuracy of identification; problems that may occur in cross-racial identifications; "weapon focus," the notion that when a victim spends time watching a weapon it detracts from the time during which he or she can view the assailant or assailants; the decrease in the ability of a witness to identify a given individual when there have been multiple assailants; the finding that humans do not have a highly devel-

oped time-estimation skill; and the effect of showing a witness a set of photographs on two separate occasions when one of the photographs is repeated. During a long voir dire hearing on Buckhout's qualifications, research, and potential testimony as well as on counsel's arguments in favor of and against his testifying, the trial justice qualified Buckhout as an expert in the field of memory psychology. Counsel conducted extensive direct and cross-examination. The jury was not present in the courtroom during the voir dire proceeding, which consumed more then eighty pages of transcript. The trial justice excluded the expert's testimony, stating:

> "This Court feels that based on the evidence that has been adduced in this case and the issues to be resolved by the jury in this case that the testimony pr[ ]offered tends to mislead the jury. More importantly, [be]cause jurors [d]o tend to give a higher degree of reliability to expert testimony by their very nature of being experts and I find that the evidence in this case and the facts before this jury are sufficiently within the framework of lay opinion; that it is not necessary and I find it is not relevant to have expert testimony as to eyewitness identification."

The trial justice seemed concerned about certain areas of the potential testimony and occasionally asked questions to clarify matters. After having asked a few questions during the prosecutor's cross-examination of Buckhout, the trial justice then inquired, "And you have no idea about this particular witness in this particular case, her level of stress, is that correct?" Buckhout responded that no one else did either and that he was working with the evidence that had been presented to him. The trial justice then referred counsel to Rules 402, 403, and 702 of the Rhode Island Rules of Evidence. The record indicates that the trial justice excluded Buckhout's testimony based on the grounds that it would mislead the jury, that it was lay opinion, and that it was not relevant.

The defendant claims that the expert testimony should have been admitted under Rule 702. The defendant contends that the trial justice's refusal to allow the testimony consti-

tuted an abuse of discretion for several reasons, including defendant's assertion of an alibi defense and the argument that the prosecution's proof rested wholly on Bassett's identification testimony. The defendant also maintains that certain issues could have been explained only by expert testimony, which could have disabused the jurors of certain "common misconceptions." The defendant acknowledges that the standard of review is abuse of discretion but argues that under the facts of this case the trial justice's exclusion constituted an abuse of discretion.

The state contends that the trial justice correctly excluded Buckhout's testimony. It compares this case with *State v. Porraro*, 121 R.I. 882, 404 A.2d 465 (1979), in which this court upheld the exclusion of expert testimony on the issue of eyewitness identification and held that the trial justice did not abuse his discretion. *See id.* at 892–93, 404 A.2d at 471. The state argues that this case presents at least as many factors that militate against admission of the expert testimony as this court found sufficient for exclusion in *Porraro*. The state points to defense counsel's extensive cross-examination of Bassett, in which he "did almost nothing but attack the reliability of her identification of his client." The state contends that defense counsel raised many of the issues on which defendant had sought to admit Buckhout's testimony in his cross-examination and closing argument. The state also points out that the trial justice instructed the jurors that identification testimony should be reviewed carefully and gave certain guidelines for their consideration. The state also avers that the trial justice correctly concluded that Buckhout's proposed testimony was not beyond the jurors' common knowledge and that he could not testify to anything regarding the reliability of the witness's identification in this particular case.

At the outset of our analysis, we note that both parties devoted extensive discussion in their briefs to state and federal case law concerning the admissibility of expert testimony regarding eyewitness identification. Before we can consider whether the expert testimony would have misled the jury or was within the common knowledge of jurors, however, we must address the threshold question of relevancy. The trial justice concluded, among other things, that Buckhout's testimony was irrelevant to this case.

■ Rule 402 states that "[a]ll relevant evidence is admissible," with certain exceptions, but that irrelevant evidence is inadmissible. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This court has held that the question of relevancy is within the sound discretion of the trial justice. *See State v. Mora*, 618 A.2d 1275, 1279–80 (R.I. 1993). We do not consider a trial justice's ruling on relevancy to be reversible error unless it constitutes a prejudicial abuse of discretion. *See State v. Squillante*, 622 A.2d 474, 482 (R.I.1993).

The record does not reflect that the trial justice abused his discretion in excluding the testimony; rather, he made a careful decision after considering the substance of the proposed testimony and the arguments of both parties as well as case law. Both parties had the opportunity to conduct substantial direct and cross-examination of the proposed expert witness at the voir dire hearing and to present arguments for and against the admission of this testimony. The trial justice asked Buckhout questions to clarify Buckhout's testimony and to relate Buckhout's testimony to this case. He also pointed out certain rules of evidence that he thought counsel should consider and address. We conclude that he did not prejudice defendant by excluding evidence that he determined was not relevant. We are persuaded from the record that the trial justice did not abuse his discretion by excluding this evidence on relevancy grounds. Therefore, we do not reach the remaining arguments that the parties raise with regard to this evidence.

## II

■ A. The defendant argues that the trial justice committed error by denying defendant's motion to suppress Bassett's in-court and out-of-court identifications. The defendant claims that the trial justice erred

in finding that the identification procedures that the Warwick police department used were not suggestive and that the trial justice should have precluded Bassett from identifying Gardiner because she was not competent to do so under Rule 602. The state asserts that both of these arguments are meritless.

■■ Consistent with United States Supreme Court rulings, this court has delineated a two-step analysis to determine whether an identification procedure that the police used violated a defendant's due-process rights. *See State v. Mastracchio,* 612 A.2d 698, 704 (R.I.1992). A court must first consider whether the identification procedure used was unnecessarily suggestive. *Id.* If the answer to the first part of the test is in the affirmative, the court must then determine whether the identification lacks independent reliability despite the procedure's suggestiveness. *See id.; see also Manson v. Brathwaite,* 432 U.S. 98, 105–07, 114, 97 S.Ct. 2243, 2248–49, 2253, 53 L.Ed.2d 140, 148–49, 154 (1977); *Neil v. Biggers,* 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401, 410–12 (1972). If an identification procedure is determined to be "unnecessarily suggestive and conducive to a substantial likelihood of misidentification so that the accused is stripped of his or her due-process rights," an out-of-court identification by a witness is inadmissible at trial. *Mastracchio,* 612 A.2d at 704; *see also Neil,* 409 U.S. at 198–99, 93 S.Ct. at 381–82, 34 L.Ed.2d at 410–11.

Prior to trial, defendant moved "to suppress any and all identification of the defendant which the State intends to employ at trial" on the grounds that they resulted from an impermissibly suggestive identification procedure and were unreliable under *Manson* and *Neil.* In order to make a ruling on this issue, we must discuss some of the testimony adduced at the pretrial suppression hearing and at trial.

At the suppression hearing, Bassett testified that she had seen defendant a total of three times prior to September 6, 1989, twice in person and once in a photograph. On an afternoon in June 1989, Bassett saw defendant in front of her house in a face-to-face confrontation, which she testified lasted at least five minutes and during which she spoke to Gardiner. Later that evening she saw him again. Based on the evening incident, Bassett gave a statement to the police regarding what she had seen and included a description of defendant, whose name she did not know at that point. At the Warwick police department in June 1989, Bassett was shown a book of photographs to look for the man whom she had seen committing the crime that she had reported. She selected photograph number 94, but only later did she learn that this person was Gardiner. She testified that she first found out who Anthony Gardiner was through her neighbors, after she had given her statement to the police in June.

Bassett also testified that upon her return to her home from the hospital the day after the attack in September 1989, she spoke with three Warwick police officers. They showed her a book of photographs, through which she looked. She recognized a photograph of a blond man whom she believed to be one of her assailants and a photograph of defendant. She testified that she "automatically recognized" defendant out of a number of photographs of black men and pointed him out. She later testified that she "was positive" upon her selection of defendant's photograph that he was the black male who had attacked her the night before. The number of the photograph was 94.

Warwick police officer Mark Brandreth (Brandreth) testified during the suppression hearing that he was one of the police officers who had shown Bassett the book of photographs on September 7, 1989. He stated that he had placed a photograph of Gardiner and one of Fines in the book but was unaware that a photograph of Gardiner had been placed in a photo book presented to Bassett in June. He also stated that he put defendant's photograph in slot number 94 without knowledge that a photograph of defendant had previously been placed there. He further testified that the book contained approximately twelve photographs of black men, six on either side of one page. Of the six males whose photographs were on the page where Gardiner's photograph was placed, Gardiner was the only one shown in a

frontal shot and a head shot facing left; the others were shown facing right. In contrast to the other photographs on the page, defendant's was the only one with a white border around a blue square.

Bassett testified that when she viewed the photo book in September, the number 94 did not mean anything to her, and that she did not even recall seeing it. In response to the prosecutor's query whether anything about the photograph of the black male that she selected in September distinguished it from the other photographs, Bassett stated, "Yes. He was the one who attacked me. The others weren't." The following took place on cross-examination of Bassett:

> "COUNSEL FOR DEFENDANT: And on September 7th you made the selection of a black male which was # 94, isn't that right?
>
> "BASSETT/WITNESS: I don't know. I believe so.
>
> "THE COURT: No, not what he said. Do you recall seeing 94 and saying that's the man?
>
> "BASSETT/WITNESS: No, I'm sorry.
>
> \*     \*     \*     \*     \*     \*
>
> "COUNSEL FOR DEFENDANT: Well, today's not the first day you are learning that Anthony Gardiner was # 94 in the book that you looked at?
>
> "BASSETT/WITNESS: I don't even remember the number now.
>
> \*     \*     \*     \*     \*     \*
>
> "THE COURT: But on September 7th when you looked at this book were you aware you had picked out # 94 in June?
>
> "BASSETT/WITNESS: No, I was not aware.
>
> "COUNSEL FOR DEFENDANT: Well, did you have some discussions with [the prosecutor] about this # 94?
>
> "BASSETT/WITNESS: So many times I have been asked do you remember the # 94? And I believe it came about since the last trial. I don't remember picking out a number. *I picked out a person not a number.*" (Emphasis added.)

The trial justice denied defendant's motion to suppress. The trial justice applied the correct two-part test. He found as a matter of fact that there was no suggestiveness in the police procedures. He also found credible Bassett's testimony that she did not even notice the white masking or the number 94. He concluded that the first step of the test had been satisfied—there was no suggestiveness. He also stated that if the first part of the test had not been met, he would have found that the second step had been satisfied because Bassett had sufficient time to observe her assailants.

When we review the decision of a trial justice on a motion to suppress, our duty is "to view the evidence in the light most favorable to the government and apply the 'clearly erroneous' rule." *Mastracchio*, 612 A.2d at 705 (quoting *State v. Gomes*, 604 A.2d 1249, 1253 (R.I.1992)). Viewing the evidence in the light most favorable to the state, we find that the trial justice was not clearly in error. The trial justice properly engaged in the two-step analysis and carefully considered the testimony. We cannot say on this record that he was clearly in error in concluding that the police procedures were not suggestive and that, even if they were, the out-of-court identification was independently reliable.

During the trial, Bassett identified defendant in court as the black man who had attacked her. She also testified regarding the June incident in greater detail than at the suppression hearing. She testified that the man involved in the June confrontation with her neighbor, in which she intervened, was the person whom she had identified in the courtroom. She also stated that as a result of seeing what Gardiner was doing that evening, she filed a criminal complaint with the police against Gardiner and became a witness in the case. We conclude that, because the out-of-court identification was sufficiently reliable, the in-court identification was also proper. *See Mastracchio*, 612 A.2d at 705–06.

■ B. The defendant also argues that the trial justice should not have permitted Bassett to make any identification of Gardiner because she was not competent to do so under Rule 602. This rule provides in part

that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

The defendant argued at the suppression hearing that Bassett's identifications of him were not reliable because she could not have seen what she claimed to see. The defendant maintains, among other things, that Bassett did not have a sufficient opportunity to see her assailants, and that her degree of attention was short and also diminished by the fact that multiple assailants and a weapon were involved. *See generally Neil,* 409 U.S. at 199–200, 93 S.Ct. at 382, 34 L.Ed.2d at 411.

The state argues that Bassett had more than ample opportunity to view defendant in light sufficient to qualify her identification as competent and reliable. The state also contends that defendant simply ignores Bassett's testimony in arguing that she was not competent to identify him and ignores the testimony of other witnesses who stated that although the woods were dark, it was light enough so that a person could recognize another.

Bassett testified that during the struggle over the tape, she could see the faces of both men. As she was lying on her side on the ground during the taping episode, she saw the black man's face for "a few seconds * * * the most thirty seconds." Part of that time she viewed him from a distance of a foot or less. Bassett further testified that she had many other opportunities to see defendant's face throughout the attack. The closest range at which she saw his face was a few inches from her face. The farthest distance was a few feet, and she had more than one face-to-face look at him. She testified that lights on behind the apartment building illuminated the yard between the building and the woods. In the woods where the struggle over the tape took place, the lighting was "poor, but if in close range, visible," Bassett testified. She also stated that at the location deeper in the woods she was able to see the facial features of her black assailant, who was at very close range.

We are persuaded that Bassett had ample opportunity to see her black assailant and that the lighting was sufficient. She did testify from personal knowledge. Therefore, we conclude that the trial justice did not abuse his discretion in allowing the identification. *See State v. Ranieri,* 586 A.2d 1094, 1098–99 (R.I.1991).

## III

The defendant contends that the trial justice committed error in denying his motions to pass the case. Specifically, defendant argues that the trial justice erred in denying three of his motions to pass the case, which he made at the following points in the trial: (A) after the prosecutor questioned defendant regarding whether he had used alcohol or drugs on the night of the incident; (B) after Brandreth had testified for the state that he showed Bassett a "mug" book; and (C) after, in his view, the trial justice improperly rehabilitated a state's witness.

■ We review a trial justice's decision regarding a motion to pass the case using an abuse-of-discretion standard. *See State v. Usenia,* 599 A.2d 1026, 1032 (R.I.1991). We shall apply this standard to each of the three motions to pass.

■ A. Gardiner testified at trial and presented an alibi defense. During cross-examination, the prosecutor sought details regarding his activities on September 6, 1989. Gardiner testified that in the evening he and a friend went to Rocky Point Park, but he did not recall at what time. The following exchange then took place:

"STATE: Did you have anything to drink that night?

"DEFENDANT/WITNESS: No.

"STATE: Any drugs?

"DEFENDANT/WITNESS: No."

Counsel for defendant then moved to pass the case, arguing that the state had no basis upon which it could justify asking the questions regarding drug or alcohol consumption. In response, the state asserted that Bassett had testified that defendant spoke in a slurred voice and that Gardiner had testified that he could not recall certain details of his activities that evening.

The trial justice stated that the testimony elicited under cross-examination did not show that Gardiner consumed alcohol or drugs such that a foundation would have been established for those questions. He reserved a decision on the motion to pass and pointed out that if he thought that the prosecutor had acted deliberately, he would have granted the motion. The following day he instructed the jury that the questions were improper without a preliminary hearing and stated that no evidence was before the court regarding defendant's consumption of any alcohol or narcotics. He gave a cautionary instruction, then sent the jurors to deliberate concerning whether the prosecutor's questions or the various cautionary instructions that the trial justice issued throughout the trial would affect their ability to issue a fair and impartial verdict. The jurors returned with the results of their polling themselves; they all agreed that the queries and instructions would have no bearing on their decision. The trial justice then denied the motion to pass the case.

The defendant argues that this questioning of Gardiner was improper because there was no evidentiary foundation for having asked such questions. He claims that in *State v. Amaral,* 109 R.I. 379, 285 A.2d 783 (1972), this court established a procedure to be followed in criminal trials before either side may elicit evidence of alcohol consumption. The defendant contends that the prosecutor's questions were prejudicial and improper, notwithstanding the fact that defendant answered both queries in the negative and the fact that the trial justice issued a cautionary instruction.

The state agrees with the trial justice's denial of the motion and argues that in the context of a nearly two-thousand-page transcript defendant's contention that these two questions constituted reversible error is "absurd." The state also avers that the query regarding "anything to drink" did not specify alcohol and that whether defendant had been drinking or taking drugs was irrelevant to the issues in the case.

We find that the trial justice sufficiently cured what he told the jurors was improper questioning. He sent the jurors to poll themselves and was satisfied that the prosecutor had acted in good faith. We conclude that he did not abuse his discretion in denying this motion to pass the case.

We distinguish one of the cases that defendant cites. He claims that the procedure prescribed in *Amaral* should have been followed. In *Amaral,* this court stated that "[w]henever the question of the consumption of alcoholic beverages is raised *in a case such as this,* before evidence of drinking intoxicants may be presented to the jury, the trial justice shall conduct a preliminary hearing on this issue in the absence of the jury." (Emphasis added.) 109 R.I. at 387–88, 285 A.2d at 788. *Amaral,* however, was a case in which the defendant had been charged with driving under the influence of intoxicating liquor and driving to endanger, death resulting. *See id.* at 380, 285 A.2d at 784. The instant case is distinguishable on its facts.

■ B. The defendant argues that the trial justice erred by refusing to pass the case after Brandreth testified that he showed Bassett a photo "mug" book. He so stated in response to a question regarding why he and another police officer returned to 35 Lake Street on the morning after the attack. The defendant objected, and the trial justice sustained the objection and instructed the jury to disregard the answer. The defendant argued that the court should pass the case because Brandreth's characterization of the photo book served to put the jury "on notice" that Gardiner had had prior police contact. The prosecutor assured that the use of the term mug book was inadvertent and that the record would contain evidence of Gardiner's prior police contact. The trial justice agreed that the comment seemed inadvertent but expressed concern regarding the impact on the jury. He took the motion under advisement and stated his belief that Brandreth's use of the term was inadvertent.

The next day the trial justice denied the motion, having noted that the case involved the intimidation of Bassett as a witness in the June incident implicating Gardiner. The defendant declined the trial justice's offer of a curative instruction.

We conclude that the trial justice did not abuse his discretion in denying this motion to pass. He instructed the jury to disregard the answer, he concluded that the reference was not purposeful, he offered to give a curative instruction, and he acknowledged that the jury already knew that defendant had had some type of prior contact with the police. The issue here is not the admissibility of mug shots, but rather whether Brandreth's reference to a mug book was so prejudicial that it warranted a mistrial. We agree with the trial justice that this comment did not reach that level. (We note parenthetically that several times at the suppression hearing and at least once in the brief-in-chief submitted to this court, defense counsel referred to a photo identification book as a mug book for a purpose other than to challenge Brandreth's use of the term.)

■ C. Finally, defendant argues that the trial justice erred by denying the motion to pass that he made after the trial justice improperly "rehabilitated" a state witness. During defense counsel's cross-examination of Warwick police detective sergeant Richard Santos (Santos), the chief investigating officer on this case, Santos stated that he had testified before the grand jury that ultimately indicted Gardiner and his codefendants as follows: that Bassett had said she believed that her black assailant was Gardiner but that she was not "quite sure." The trial justice interrupted the cross-examination and asked, "But also you further said to the Grand Jury when she was shown a photographic book she positively identified Anthony Gardiner, is that correct?" Santos replied, "That's correct, Your Honor." Then the trial justice inquired, "That's in the same testimony you said she wasn't quite sure, isn't that right?" Santos answered in the affirmative. The defendant moved to pass the case on the ground that by asking those questions the court assumed an advocacy role for the state and departed from its role as an impartial tribunal.

The trial justice stated:

"the Court does not feel it has to sit here, as one lawyer in the North hearings said, as a potted plant. The inquiry by Mr. Cicilline left it in this Court's opinion to the jury that this was Sergeant Santos' testimony and that it was his observation and his questioning that resulted in there [sic] belief to be Anthony Gardiner. * * * I feel that this Court, at least as far as I'm concerned, has an absolute right to make sure that justice is done for both."

At defendant's request, the trial justice then instructed the jurors that they were the sole triers of fact and that they should not give more importance to his questions than to the other questions asked by the attorneys. He also stated that this was his "way of satisfying in [his] own mind what the evidence" was and that he did not advocate the position of either the state or defendant.

We conclude that the trial justice did not abuse his discretion in denying this motion to pass. We are persuaded that the trial justice was trying to clarify something that might have confused the jury and that, therefore, his questioning was proper and not prejudicial. *See State v. Evans,* 618 A.2d 1283, 1284 (R.I.1993) (per curiam).

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of the Superior Court is affirmed, and the papers of this case are remanded to the Superior Court.

FAY, C.J., did not participate.