STATE

v.

Bernardo FIGUEROA.

No. 91–124–C.A.

Supreme Court of Rhode Island.

April 15, 1996.

Annie Goldberg, Asst. Attorney General, Aaron Weisman, Asst. Attorney General, for Plaintiff.

John A. Macfadyen, III, Providence, for Defendant.

## OPINION

BOURCIER, Justice.

Bernardo "Benny" Figueroa (defendant) appeals from his October 12, 1990 judgment of conviction for the second-degree murder of his wife, Susan Joubert Figueroa. The de-

fendant was found to have killed her during the early morning hours following Christmas 1986 after twice firing upon her with a shotgun. For the reasons that follow and after dissertation of the pertinent facts, we affirm the defendant's judgment of conviction.

## Facts and Case Travel

The defendant, an admitted drug dealer, and his wife, Susan, spent Christmas Day 1986 at the home of Susan's grandmother in Cranston. The couple returned to their apartment at 482 West Fountain Street in Providence sometime after eight o'clock that evening. Neighbors testified at the defendant's trial that they heard noises that sounded like a "bang or backfire" from a car at about 1 a.m. Some thirty minutes later, other loud "bangs" were heard. The state contended that at least two of the loud noises were caused by the defendant's firing of a shotgun at his wife. She was found dead in their apartment that morning with shotgun wounds to the upper chest and left leg.

At trial, the state relied heavily upon the testimony of two of the defendant's acquaintances, Michael Badessa (Badessa) and Larry Fraielli (Fraielli). Both testified that they had been called on the night of the shooting by the defendant and were asked to come over to his apartment because he needed transportation. When they arrived at defendant's apartment at about twelve o'clock Christmas night, they testified that they had to knock on the apartment door and identify themselves several times before the defendant would open it. When the defendant finally did open the door, he said, "Get in here." Badessa and Fraielli further testified that defendant then pointed a shotgun at them, and as he did, they noticed his wife, bleeding severely, lying on the floor beside a mattress.

Badessa testified that earlier that evening he had seen the defendant and his wife in nearby Decatur Square. At that time he saw the defendant pull a shotgun from underneath his coat, pointing the weapon's barrel upward, walking, "like a soldier." Badessa testified that defendant was acting "kind of strange, like if he was drunk or high." Later, when Badessa arrived at the Figueroa

apartment near midnight, he noticed that the shotgun in defendant's hands was the same one he had seen defendant carrying in Decatur Square earlier that evening. Badessa also testified that during the confrontation at the defendant's apartment defendant pointed the shotgun at him as well as Fraielli and ordered them to stand against a wall. Badessa further testified that about one minute later, Fraielli jumped at the defendant and began struggling with him in an effort to wrest the shotgun from defendant's grasp. Badessa, at that time, fearful of being shot, fled the apartment.

Under cross-examination Badessa admitted that he was a convicted felon, having been convicted of breaking and entering. He also acknowledged that after he dashed out of defendant's apartment, he did not go to the authorities to report Susan Figueroa's plight or the defendant's actions and possession of the shotgun, but instead went to a friend's house. Badessa claimed that he was frightened and did not know what to do.

Fraielli testified to substantially the same factual events as did Badessa. He said that he was visiting at his sister's house earlier that Christmas evening, and while looking out of a window saw defendant, his wife, and Badessa standing in Decatur Square. Later that evening, Badessa came to Fraielli's sister's house and told him that defendant had requested they come to his apartment to give him a ride. Fraielli contacted defendant by pager (beeper), and when defendant responded to the page by telephone, Fraielli asked him if he indeed needed a ride. The defendant replied that he did, and Fraielli and Badessa then drove to the Figueroa apartment. Fraielli testified that he and Badessa arrived at defendant's West Fountain Street apartment shortly before midnight.

Fraielli's testimony concerning what occurred when he and Badessa arrived at the apartment was materially in accord with Badessa's recollection and testimony. He testified that they had to knock several times and identify themselves before defendant opened the door. Fraielli testified that when the defendant finally opened the door, he was carrying his baby as well as a shotgun that he pointed to Fraielli's face. The defendant

told Fraielli, "Get in here." Fraielli then testified that at that moment Badessa began screaming, "Don't shoot me." Fraielli then heard the sound of someone gasping for breath and saw Susan Figueroa on the floor next to a mattress. Fraielli testified that Susan was "rolled up like a doll" and that "there was a ton of blood there."

Fraielli further testified that in an effort to calm Figueroa down, he said to him, "Let's get rid of the body." He then moved closer to the defendant and grabbed the baby from him. He heard Badessa screaming, "I don't want to die, I don't want to die." Fraielli said he responded, "Shut up. Nobody is going to die." Fraielli then dropped the baby, jumped at the defendant, and grabbed the shotgun. While the two struggled, Badessa fled the apartment. Fraielli, in the meantime, was able to pull the shotgun from defendant's hands and, after doing so, he too then ran out of the apartment with the shotgun. Fraielli testified that he ran by the place where his car was parked because he feared that the defendant might have another gun and would fire at him from the apartment window if he took the time to attempt to enter his vehicle. After running a short distance, Fraielli said he threw the shotgun into a yard on Carpenter Street. He then decided to go to his father's house, and enroute, some Providence police officers stopped and arrested him. After being held overnight, Fraielli told police detectives what had happened at the Figueroa apartment. The shotgun he told the detectives he had discarded on Carpenter Street was thereafter recovered by the police later that morning.

In addition to Badessa and Fraielli, some of defendant's neighbors were called to testify. One of those neighbors, Lillian DeSimone (DeSimone), related that she heard a noise like the backfire from a car at about one o'clock the morning after Christmas. At about 1:30 a.m., she heard three more of the same sounds. DeSimone, who lived in a second-floor apartment beneath defendant's apartment, also said that she heard scuffling on the floor above that sounded like people tumbling around. She further testified that

seconds before the scuffling began, she heard a male voice say, "I didn't mean to do it, Larry." [1]

The defendant's next-door neighbor, Deborah Patterson (Patterson), testified for the state. She testified that she heard "this big boom" sounding like a car backfiring coming from the direction of the Figueroa apartment at about 1 a.m. About thirty minutes later she heard two other loud bangs that seemed to emanate from the same area. Patterson testified that she and her husband then went out onto their front porch to see what, if anything, had happened and heard the Figueroas' baby crying as if frightened. She said she then heard a male voice say, "Benny, we're friends, aren't we? Put the baby down."

On cross-examination, Patterson was questioned about her ability to pinpoint the source of the bangs and the male-spoken words. She was asked if when she heard the noise and the male voice she was out on the front steps of her house. Patterson replied that she was, and then added, "We heard that, and I said, 'David, I heard—he hurt the baby before. I'm afraid.'"

At this point defense counsel, without offering objection to the witness's statement, asked to approach the judge's bench. After an off-the-record side-bar conference discussion, the Superior Court trial justice then inquired of Patterson at the side-bar concerning the statement. The trial justice was of the impression that the witness had used the word "heard," and not "hurt." However, the witness related that she had used the word "hurt," which was also what the stenographer had perceived and had recorded as being Patterson's answer to defense counsel's question.

Defense counsel then moved for a mistrial on the basis of the witness Patterson's remark. Counsel contended that the witness's statement suggested to the trial jury that defendant had on a prior occasion inflicted injury upon his own child, and as such, was "so highly inflammatory" as to be overly prejudicial to the defendant in the eyes of the jury. Counsel argued that the witness's an-

1. The reference to "Larry" apparently was to    Larry Fraielli.

swer would give the jurors the impression that since the defendant was capable of inflicting injury upon his baby, he would more than likely be capable and inclined to inflict injury upon his wife.

The trial justice denied the mistrial motion. She did so only after first diligently questioning the jurors, individually, in an effort to discern what each had heard the witness Patterson say about the defendant and his baby. That questioning procedure revealed that three of the fourteen jurors reported that they recalled hearing some variation of the Patterson remark but all to the effect that the defendant had hurt the baby. Those three jurors were then specifically and individually instructed by the trial justice to disregard the testimony each heard concerning the baby. They were also told by the trial justice that she had stricken Patterson's answer from the trial record, and, as such, it was not evidence and was not to be utilized during jury deliberations. The entire jury was then next brought into the courtroom, and the trial justice proceeded to carefully and precisely give a curative instruction. She told the jurors that they were not to consider or to discuss with one another any of the colloquy each had had with the trial justice at any time during the remainder of the trial and, in particular, during the jury's deliberative process. The trial justice then asked each juror for his or her assurance that each would totally disregard Patterson's answer, and all replied in the affirmative. Defense counsel objected on the record to the trial justice's juror-examination procedure and to her denial of the defendant's motion for a mistrial.

After the trial resumed, the state presented additional witnesses, two of whom were Gloria Tiberi (Tiberi) and Leona Grace (Grace). Tiberri, a friend, who had grown up with the deceased, Susan Figueroa, testified that she had socialized almost on a daily basis with the defendant and Susan. Tiberi testified that on the Christmas Eve preceding the murder, she spoke with the defendant. She testified that defendant told her, "Gloria, Susan's pregnant and its not my baby." According to Tiberi, defendant also told her that he was upset at not being the biological father. She further testified that the defendant called her on January 1, 1987, and told her at that time that he needed to get in touch with Susan's mother, Leona Grace, "[s]o I can tell her what happened and she can put me in jail so I can pay for what happened to Susan."

Grace testified. She stated that she did not see the defendant at his West Fountain Street apartment in the early morning hours shortly after being informed that her daughter had been murdered. Likewise, she recalled that she did not see him at Susan's wake or funeral. She testified, however, that she received a telephone call from him a few days after the murder. During that telephone conversation, he told her that he did not kill Susan. Grace testified that she then told the defendant that if he did not kill Susan then he should turn himself in to the police. She testified that defendant called her on several later occasions and that the conversations were all essentially of the same nature.

The defendant testified. He said that he fled the apartment moments after Susan was shot. His version of the events that took place prior to her being shot differed markedly from that of the state's witnesses. Admitting that he had dealt cocaine for three years prior to the shooting, he said that two New York drug dealers to whom he owed several thousand dollars were the ones who murdered his wife that Christmas night. He testified that the drug dealers used the shotgun that Fraielli had left with him at the apartment. He testified that one of the drug dealers, after finding the shotgun, aimed it at him as he held his baby, and that Susan, sensing danger to the baby, suddenly rushed in front of the drug dealer to push the shotgun away, and while doing so was shot by the out-of-state dealer. The defendant said he then fled Rhode Island, and remained away for some three years living primarily at two addresses in Massachusetts. He said he remained away because he was afraid to return, fearing that the drug dealers or their confederates would kill him. During the period of time that the defendant was absent from Rhode Island, a Providence County grand jury indicted him on July 8, 1988, for

the murder of Susan. A warrant for his arrest was issued that same day. The defendant was later arrested on March 5, 1990, in Massachusetts, and returned to this state for trial. He was tried and convicted some seven months later, in October, 1990.

After presentation of the trial evidence and completion of trial, but prior to closing arguments, the state requested the trial justice to instruct the jury with regard to defendant's flight from Rhode Island after the murder. The state's request was based upon this Court's holding in *State v. Brown,* 528 A.2d 1098 (R.I.1987). The trial justice, after the state's request, then asked defense counsel if there was any objection to the state's proposed flight instruction. Defense counsel simply replied, "I would for the record, Your Honor." The following day the trial justice, in the course of her instruction to the jury, did include a flight instruction essentially in accordance with our holding regarding flight in *Brown.* Upon completion of her instructions to the jury, she once again asked defense counsel if he had any objections to the instructions. Defense counsel replied, "None, Your Honor." The jury was then excused to deliberate and later, that afternoon, on October 12, 1990, returned a verdict, in which it found the defendant not guilty of first-degree murder, but guilty of second-degree murder. He was later on February 15, 1991, sentenced to a term of life imprisonment. His notice of appeal was duly filed on February 22, 1991. Because of several changes of appellate counsel, his appeal was finally argued before this Court on December 7, 1995. The defendant contends that the trial justice committed two trial errors that necessitate reversal of his jury conviction and the granting of a new trial. First, he claims that the trial justice erred in denying his motion for a mistrial based upon the stricken remark of the witness Deborah Patterson concerning the defendant having previously injured his baby. Second, he asserts that the trial justice erred by instructing the jury regarding evidence of flight. We address each of these arguments in turn.

### The Stricken Remark

The defendant claims that Patterson's testimony concerning her spontaneous statement to her husband, "David, I heard—he hurt the baby before. I'm afraid," was so highly inflammatory that it could only have left an indelible impression on the minds of the jurors to the effect that if the defendant was so base and vile a person as to be capable of inflicting injury upon his own infant child, he would certainly be equally capable and likely to do violence to his wife. He contends that no curative instruction by the trial justice could ever remove that prejudice from the minds of the jurors. We disagree.

■ After first thoroughly questioning the jurors, the trial justice did give a curative instruction. She carefully, methodically, and thoroughly engaged each of the fourteen members of the jury, individually, in a colloquy to determine what each had heard of the witness's challenged statement. Our review of the trial transcript reveals that only three of the fourteen jurors could remember the witness Patterson saying that the defendant had hurt the baby on a prior occasion. One juror believed she heard the witness say, "[t]hat Benny had hurt the baby before," another recollected the witness as saying, "that Benny hurt the child before," and a third remembered the testimony to be, "Something about he's done it before, he's hurt the baby before." The other eleven jurors could not recall what had been said, or, did not hear Patterson's statement.

Initially we note that the trial justice first found that the statement by Patterson was not made as the result of an open-ended question posed by defense counsel. Additionally, the trial justice was satisfied that the statement was not intentionally made by the witness to discredit the defendant. Defense counsel himself admitted as much in stating to the trial justice, "I would suggest that it's just one of those unfortunate things that happens where a witness is trying to be as candid as she can and says something that's not germane to the issues to be determined by the jury." We are satisfied that the witness's answer was clearly of a gratuitous nature and was not responsive to the question posed, which was only directed to

the time when the witness stated she was on her front porch.

We note additionally that the trial justice spoke privately with each of the three jurors who did recall hearing the witness's statement pertaining to defendant having previously hurt his baby, and she informed each of those jurors that the witness's statement concerning that matter had been stricken from the record and was to be totally disregarded by them. The trial justice also told the three jurors that they should not discuss their recollection of the witness's answer with any of their fellow jurors. She thereafter informed the entire jury that the witness's answer was to be disregarded by them and was not in any manner to be utilized or relied upon during their jury deliberations.[2] The trial justice also instructed the entire jury panel not to discuss any of the contents of their individual one-on-one discussions with the trial justice that had taken place earlier. Finally, as an additional safeguard of the defendant's rights, the trial justice in her charge to the jury included a general instruction covering the challenged statement. She said, "Ladies and gentlemen, also, in this case, if I have stricken testimony from the record, you must pretend that you didn't hear it because it's not part of the record in this case."

■ It is conceded, as defendant contends here, that certain improper testimony when infused into a trial can mandate the trial's termination on a motion for a mistrial. In *State v. Costa,* 111 R.I. 602, 306 A.2d 36 (1973), this Court remanded to the Superior Court for a new trial a case in which a witness for the prosecution improperly testified concerning a defendant's criminal record. We remarked in *Costa:*

"When improper and extraneous matter of a harmful nature is intentionally injected or accidentally creeps into the evidence, it is the duty of the trial justice, upon complaint being made, to free the evidence from such matter, if possible, with proper warning to the jury. On the other hand, if

this is not reasonably possible, then he ought to pass the case." 111 R.I. at 609, 306 A.2d at 40 (quoting *State v. Peters,* 82 R.I. 292, 297, 107 A.2d 428, 430–31 (1954)).

■ Both *Costa* and *Peters* stand for the proposition that despite a trial justice's cautionary instruction to a jury following improper introduction of prejudicial matter in a trial, there always remains for this Court the ultimate resolution of the question of whether any such instructions were sufficient "to have disabused the jury's mind of the prejudicial effect of the objectionable evidence." *Costa,* 111 R.I. at 610, 306 A.2d at 40. In *Costa* we further expressed our concern that, on appeal, this Court must be satisfied that the cautionary instructions removed from the deliberative process "the taint represented by the enveloping smoke of a criminal record." *Id.*

Although the witness Patterson's remark concerning defendant's prior infliction of injury upon his infant child was not an assertion that the defendant had a criminal record, as in *Costa,* we acknowledge, however, the inherent potential prejudicial effect that such a statement could possibly have upon a jury, if not properly rectified, by action of the trial justice.[3] In this case, the trial justice responded both promptly and properly to the situation, and we believe that any taint that may have been caused by the witness's spontaneous statement was satisfactorily eradicated by the trial justice's previously recounted painstaking efforts. In so concluding, we ·distinguish this case from the facts present in *Costa* where the trial justice's cautionary instruction to the jury in that case was totally inadequate. In *Costa,* the jurors were simply told to disregard "the last three or four questions and answers that were given by this witness." 111 R.I. at 608, 306 A.2d at 39. There was no specific curative reference to the tainted testimony, and we found that the defendant in that case could not be said to have received a fair and impartial trial.

---

2. One of the three jurors who had heard Patterson state that defendant had hurt his baby was excused from service prior to closing arguments due to the unfortunate death of her father.

3. During cross-examination of the defendant, it was elicited from him that he did in fact have a criminal record, having pled guilty to possession of a revolver in New York on July 22, 1986.

In this case, however, there were no such imprecise instructions from the trial justice. To the contrary, the entire curative procedure could hardly have been conducted in a manner more protective of the defendant's right to a fair and impartial trial. Each of the jurors who heard the improper remark was specifically told to disregard the remark as it had been stricken from the record. Each was told that there was no evidence in the case to show that the defendant had previously harmed his child. In addition, each was instructed not to discuss the remark with any of the other jurors, and the trial justice did not reveal the contents of the remark to those other jurors who did not recall hearing the statement.

The record in this case is totally bereft of any indication that the jury in this case was incapable of following the trial justice's cautionary instructions. Accordingly, this Court assumes that the jury properly followed the trial justice's instructions as they were given. *State v. Lopez,* 583 A.2d 529, 536–37 (R.I. 1990).

■ In closing this portion of our opinion, we note that it is well-settled law that motions to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice. *State v. Martellini,* 533 A.2d 527, 529 (R.I.1987). The reason we vouchsafe such broad power in the trial justice in this regard is "that he or she possesses 'a "front-row seat" at the trial and can best determine the effect of the improvident remarks upon the jury.' " *State v. Tempest,* 651 A.2d 1198, 1207 (R.I.1995); *see also State v. Ucero,* 450 A.2d 809, 814 (R.I.1982). Therefore, the determination of the trial justice concerning a ruling on a motion to pass a case and to declare a mistrial will be given great weight, and we will not disturb that determination unless it is clearly wrong. *Tempest,* 651 A.2d at 1207. On the facts before us, we find that the trial justice conducted a penetrating inquiry to ferret out any potential prejudice to the defendant and that she subsequently ameliorated any possible damage to the deliberative process in a procedure that was both corrective and correct.

We conclude that the defendant's first claim of error is without merit.

### The Flight Instruction

The defendant's second claim of error concerns the trial justice's instruction to the jury regarding his flight from Rhode Island following the murder of his wife. That issue was not adequately preserved for appellate review and is not properly before us.

■ The trial transcript discloses that at the conclusion of the trial, but before submitting the case to the jury, the trial justice asked counsel if they wished to submit any particular instructions for inclusion in the jury charge. The state's prosecutor answered affirmatively, requesting that a flight instruction be given, citing *State v. Brown,* 528 A.2d 1098 (R.I.1987). Defense counsel responded to the trial justice's inquiry concerning any possible objection with the simple statement, "I would for the record, Your Honor." The following day, the trial justice instructed the jury and in the course of that instruction did give a flight instruction. For the purposes of this opinion, she basically charged the jurors that in their discretion, they could infer consciousness of guilt on the part of the defendant if they first found that he had fled the state in relation to the crime of murdering his wife. At the completion of the court's instruction, the trial justice asked if counsel had any objections to her instructions, and both the state's prosecutor and defense counsel responded, "None, Your Honor."

Our procedure for preserving an objection to a jury instruction in a criminal case is crystal clear. According to Rule 30 of the Superior Court Rules of Criminal Procedure:

> "No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto *before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection.*" (Emphasis added.)

There was no objection to the trial justice's instruction and no compliance with Rule 30. *State v. Cianci,* 430 A.2d 756, 765 (R.I.1981).

█ Despite the absence of objection and compliance with Rule 30, we have nonetheless held that, given extreme circumstances, when a criminal defendant raises the propriety of a jury instruction for the first time on appeal, we will, notwithstanding absence of objection, sua sponte undertake a two-part inquiry to determine whether "extraordinary circumstances" exist so as to permit exception to the "raise or waive" rule as set out in *State v. Burke*, 522 A.2d 725 (R.I.1987).

"This court's review of questions concerning basic constitutional rights, notwithstanding a defendant's failure to raise the issue at trial, is limited to the following circumstances. First, the error complained of must consist of more than harmless error. Second, the record must be sufficient to permit a determination of the issue. *See [State v.] McGehearty*, 121 R.I. [55], 62, 394 A.2d [1348], 1352, [ (1978) ]. Third, counsel's failure to raise the issue at trial must be due to the fact that the issue is based upon a novel rule of law of which counsel could not reasonably have known at the time of trial. *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984); *State v. Amado*, 433 A.2d 233 (R.I.1981); *State v. Reis*, 430 A.2d 749 (R.I.1981); *State v. Robalewski*, 418 A.2d 817 (R.I. 1980). For example, when an intervening decision of this court or of the Supreme Court of the United States establishes a novel constitutional doctrine, counsel's failure to raise the issue at trial will not preclude our review. *See Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984); *State v. Amado*, 433 A.2d 233 (R.I. 1981); *State v. Reis*, 430 A.2d 749 (R.I. 1981)." *Burke*, 522 A.2d at 731.

█ Here, as in *Burke*, the defendant has not raised an issue of constitutional significance that would warrant our departure from the "raise or waive" rule. The flight instruction in this case was properly relevant to the jury's inquiry during its deliberations. It was based on trial evidence, some from the defendant himself, that he had left the state mere minutes after his wife was shot to death. He did not attend her wake or her funeral and remained out of state for some three years. In addition, Susan Figueroa's sister testified that she received a telephone call from the defendant a few days after the murder during which he stated that he wanted to get in touch with Susan's mother so that she could "put me in jail so I can pay for what happened to Susan." The trial justice distinctly instructed the jurors that it was within the exercise of their individual discretions to determine whether defendant's flight was related to the crime charged, and, if so, to further individually determine whether that flight was because of any consciousness of guilt. The instruction did not serve to impugn defendant's right to a fair trial or any other of his constitutional rights. "It is settled practice in this state that relevant evidence of flight may be introduced as a circumstance bearing on the question of guilt that may be presented to the jury for consideration." *State v. Cooke*, 479 A.2d 727, 732 (R.I.1984); *see also State v. Peabody*, 611 A.2d 826, 834 (R.I.1992).

We discern no exigent reasons in the record before us that would justify our departure requiring both objection to a trial justice's instruction and compliance with Rule 30 before we will address a defendant's appellate and first challenge to a trial justice's instruction to a jury.

For the reasons herein above stated, the defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the papers of this case are remanded to the Superior Court.

FLANDERS and SHEA, JJ., not participating.