**STATE**

v.

**Walter TRUESDALE.**

No. 1999–338–C.A.

Supreme Court of Rhode Island.

Dec. 28, 2001.

Virginia McGinn/Aaron Weisman, Providence, for plaintiff.

Kelly Monteiro/Paula Rosin/Paula Lynch Hardiman, Providence, for defendant.

BEFORE: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, J.

A Superior Court jury found the defendant, Walter Truesdale, guilty of murdering seventy-nine-year old Irene Picard in

her own bedroom. After she had finished doing her laundry, Mrs. Picard returned to her Pawtucket apartment. Unfortunately, the defendant was still busy ransacking it for drug money. Evidently surprised by her return, the defendant apparently decided to dispatch Mrs. Picard as a potential witness to his thievery. After attending to this gruesome task by strangling and stabbing her to death, he returned to his girlfriend's apartment across the hall with fresh funds to buy more drugs.

The defendant appeals his conviction for first-degree murder, arguing that the trial justice erred in denying his motion for a mistrial and his motion for a new trial. Although a detective testifying for the prosecution expressed his belief that defendant had committed "a vicious killing," we conclude that defendant did not suffer any irremediable prejudice from this remark. Indeed, it was similar to copious testimony to the same effect previously adduced from this same witness—not only by the state but also by defendant—which evidence defendant did not object to or otherwise seek to keep from the jury. Furthermore, we hold, the trial justice did not commit reversible error when he denied defendant's motion for a new trial based primarily, if not exclusively, on defendant's tape-recorded confession to having committed the murder. Hence, we affirm the conviction.

## Facts and Travel

During the trial, a Pawtucket police detective, Donald Beech (Det. Beech), testified at length for the state. He described to the jury how defendant was unable to account for his whereabouts at the time of the murder, except by providing the investigators with a succession of false alibis. The defendant's girlfriend, Joyce Simpson, lived across the hall from the murder victim, and defendant admitted he was present in the victim's apartment building on the day of the murder. Given this opportunity for defendant to commit the crime and his suspicious behavior when the police first knocked on Simpson's door (he was observed skulking in her bedroom closet), the police immediately began to suspect him as the killer.

In the days following the discovery of Mrs. Picard's body, Det. Beech, the lead investigator on the case, conducted numerous interrogations of defendant. The police tape-recorded several of these interrogations and then had them transcribed. Because he believed from the outset that defendant had murdered the victim, Det. Beech used various tactics and techniques during these interrogations in an attempt to obtain a confession from defendant. Much of the prosecutor's direct examination and the defense counsel's cross-examination of Det. Beech relied on the transcripts of those interviews. Both attorneys quoted at length from Det. Beech's questions and defendant's answers during those sessions. As a result, the jury repeatedly heard how Det. Beech had confronted defendant with his belief that defendant had committed the murder. As he told the jury about the subjects covered during his interrogations of defendant, the detective was allowed to recount over and over again, without objection, what he said and did during this questioning that had communicated to defendant his avowed belief in defendant's guilt for having committed the Picard murder. Moreover, after the prosecutor concluded her direct examination, defendant's own lawyer took up this same thread of inquiry by cross-examining the detective using similar quotes from the interrogation transcripts—hoping, perhaps, to justify a less-

er-included-offense charge to the jury as a fallback to his not-guilty stance.

As a result, by the time of the prosecution's redirect examination, the jury was well aware that, even before he had begun interrogating defendant, Det. Beech believed that defendant was responsible for killing Mrs. Picard. And the jurors also had heard how, during the interrogation sessions, Det. Beech had tried without success to scare, cajole, wheedle, and persuade defendant into confessing to the crime. On redirect examination, the prosecutor asked the detective whether he had mentioned to defendant that, after strangling and stabbing her, the killer had placed a towel over Mrs. Picard's face and "how the person who did that cared about her." The detective replied in the affirmative, stating: "I was trying to make him [defendant] feel less evil for doing what happened to this woman; that's why I said that." The prosecutor then followed up, asking the detective "Why? Why?" To which the detective replied: "Because it was a vicious killing." At that point, defendant's attorney objected and asked to be heard at sidebar. There, he moved to pass the case on the grounds that the detective's above-quoted remarks had conveyed his belief in defendant's guilt to the jury. He argued that the statements were so prejudicial that a mistrial had to be granted because no instructions could cure the prejudice they had caused defendant. The trial justice, however, denied the motion to pass the case, opting instead to give the jury a cautionary instruction, in which he stated: "no one can tell you what your verdict should be * * * what any witness thinks has no bearing on this case." Although defendant's lawyer objected to this instruction, he did not indicate any grounds for his objection or otherwise communicate to the trial justice just how the court's cautionary remarks were allegedly defective, incomplete, or ineffective.

Later, after the jury returned a guilty verdict, the defense moved for a new trial. The trial justice denied the motion, and defendant now argues on appeal that he erred in doing so because the trial justice failed to mention any of the defense witnesses when he provided his rationale for the denial. In addition, defendant contends that the trial justice erred in finding that the jury could have returned a guilty verdict based solely on his tape-recorded confession. In his closing argument, defendant's lawyer suggested that his client's admission was merely a gallant attempt to clear his girlfriend (Simpson) of any and all suspicion for the crime. Below, we address the propriety of the trial justice's rulings on the two motions in question. Any further facts relevant to this appeal will be supplied as needed below.

## I

### Denial of Motion to Pass the Case

■ We are of the opinion that the trial justice did not err in denying defendant's motion to pass the case. Although the challenged remarks of Det. Beech ("I was trying to make [defendant] feel less evil for doing what happened to this woman [Mrs. Picard] * * * [b]ecause it was a vicious killing") might have provided grounds for a mistrial if they had occurred in a vacuum, when they are considered in the context of what evidence the jury already had heard from the transcripts of the investigative interviews about Det. Beech's belief in defendant's guilt, it is clear that the trial justice did not abuse his discretion in denying the motion.

Before Det. Beech uttered the challenged remarks, the prosecutor already

had led him through a long direct examination in which the detective was allowed to explain why he had engaged in certain confrontational interrogation techniques when he was interviewing defendant during the investigation of the murder. In the course of the prosecution's direct examination, the detective testified, without objection, that he had advised defendant, before he interrogated him, that he was a murder suspect. ("I advised him he was a suspect in the crime of murder.") When the prosecutor asked Det. Beech why he had interrogated defendant about a photograph of an irrelevant person, he responded that "it's an investigative technique to get somebody relaxed that I feel may be responsible for a crime." Repeatedly, Det. Beech indicated to the jury in both direct and cross-examination that he had been attempting to "get a confession out of" defendant during his multiple interrogations of him. Indeed, Det. Beech testified that he had informed defendant during the interrogation that "all of the evidence that I saw was pointing directly at him." Again, he told the jury that he did so "to get a confession out of him." When Det. Beech was asked why he had made arrangements with defendant's girlfriend to have her tape-record her telephone conversations with defendant, he told the jury that he had done so "because we felt that Walter Truesdale was the person who committed this crime and we wanted to see if we could get him to admit to it on tape."

Not only did defendant fail to object to these questions, he did not move to strike the answers, nor did he request that the court provide cautionary instructions to the jury. Moreover, he did not move to pass the case. Instead, through his counsel, he attempted to use these statements on cross-examination to impeach the detective's credibility and to suggest that the crime in question was manslaughter but not murder. Apparently, defendant and his counsel concluded that this evidence played right into the defense's theory that the police had narrowed their investigation prematurely to concentrate solely on defendant and, in so doing, had focused on the wrong person as the murderer. The defendant also tried to show how the police were attempting, without success, to browbeat and bamboozle defendant into confessing to a crime he said he did not commit. Accordingly, on cross-examination, defense counsel went to great lengths to show just how accusatory Det. Beech had become during the interrogation sessions in fixating on defendant as the putative murderer—even to the point of falsely representing to defendant that the police had found fingerprints, hair, and other incriminating evidence against him—evidence that simply did not exist. Thus, defendant's lawyer, on cross-examination, quoted from one of Det. Beech's interviews with defendant, as follows:

"You [Det. Beech] specifically say, 'you [defendant] admitted to me you never went into the bedroom okay. It appears that your fingerprints are on her. I'm telling you right now, okay, we got you. We got you Walter. You're fucked, okay.'

"Did you tell that to Walter Truesdale?

"Yes I did."

The defendant's lawyer then proceeded to elicit an admission from Det. Beech that he had told defendant on September 22, 1997—three days after the murder—that "everything points to you Walter." In other questions, defense counsel continued to confront Det. Beech with his own statements to defendant during the interrogations, quoting the detective as saying to defendant:

" 'You just did it at the spur of the moment. And manslaughter is one step down from that. I don't think you went into the apartment trying to kill this woman * * * you made a mistake. It wasn't a first degree murder case and you killed her as an afterthought. That's my opinion Walter.'

"That's what you told Walter Truesdale on September 22, 1997 on page 52, correct?

"That's correct."

Thus, when the detective uttered the challenged remarks on redirect examination, the defense already had flung the door wide open during the cross-examination to Det. Beech's pretrial opinions about defendant having committed the Picard murder. The jury had heard all of the above testimony without any objection from the defense and, indeed, defendant's lawyer himself had elicited additional accusatory remarks that Det. Beech had directed towards defendant during their taped interrogation sessions. For this reason, the statements in question were no different in kind or in tenor than the previous statements uttered by Det. Beech and admitted into evidence without objection— all of which had served to inform the jury that, from the very outset of this murder investigation, Det. Beech had formed a belief that defendant was responsible for killing Mrs. Picard and that he had tried very hard to induce defendant to confess to the crime by deploying various interrogation techniques.

■■■■ We review a trial justice's decision on a motion to pass a case for abuse of discretion. *State v. Gardiner,* 636 A.2d 710, 717 (R.I.1994). "It is well settled that a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Suero,* 721 A.2d 426, 429 (R.I.1998); *State v.*

*Figueroa,* 673 A.2d 1084, 1091 (R.I.1996). We have often stated that the trial justice "possesses a 'front-row seat' at the trial and can best determine the effect of the improvident remarks upon the jury." *Figueroa,* 673 A.2d at 1091 (quoting *State v. Tempest,* 651 A.2d 1198, 1207 (R.I.1995)). Therefore, the refusal of the trial justice to pass a case is accorded great deference and will not be disturbed on appeal unless it is shown to be clearly wrong.

In this case, the trial justice concluded, and we agree, that neither Det. Beech nor the prosecutor deliberately had attempted to inflame the jury when they uttered the challenged statements. *See State v. Kozukonis,* 100 R.I. 298, 303, 214 A.2d 893, 897 (1965) (holding that a prosecutor's flagrant impropriety cannot be cured by a cautionary instruction). Moreover, the trial justice was convinced that the jurors still could render a fair and impartial verdict, especially after he determined that they could abide by his cautionary instruction on the subject. *Figueroa,* 673 A.2d at 1091 (holding that the court will assume that the jury followed the trial justice's instructions). Given that the defense repeatedly had allowed the jury to hear how Det. Beech believed that defendant was the murderer, and given that defendant's lawyer had used this same evidence affirmatively in an attempt to impeach the detective's credibility and to support a possible manslaughter instruction to the jury, the challenged testimony on this same subject did not so prejudice defendant as to warrant a mistrial. *State v. James,* 557 A.2d 471, 473 (R.I.1989) (holding that a curative instruction removed any taint of prejudice). Thus, the trial justice did not err in denying the motion to pass the case.

## II

### Denial of New–Trial Motion

■■ In denying the motion for a new trial, the trial justice's review of the evi-

dence was less than exhaustive. He focused primarily on defendant's tape-recorded admission to killing the victim, which occurred in a telephone call between defendant and his girlfriend, Joyce Simpson. As the trial justice noted: "He admitted on that [tape recording] that he killed her and he gave her a reason why." Based on that evidence, the trial justice concluded, "and [on that evidence] alone, the jury could find that this defendant did, in fact, commit the murder." Thus, despite the lack of physical evidence linking defendant to the crime scene and the other reservations the trial justice entertained about the quality of the prosecution's case, the court believed that defendant's uncoerced admission of guilt—captured during a secretly tape-recorded telephone call with his girlfriend—was enough to convict him of the crime. We cannot evaluate this conclusion, however, without noting all the other circumstantial evidence pointing to defendant's guilt (including his presence at or near the scene of the crime when it was committed, his false alibis, his hiding in the closet when the police first called on his girlfriend, and his motive to commit the crimes of larceny and murder to support his drug habit). Having heard this evidence and having evaluated the witnesses' credibility, the court denied the motion because, as the trial justice put it, "I cannot say that reasonable people could not have found this defendant guilty."

The defendant suggests on appeal, as did his trial attorney in his closing argument, that he had confessed in that taped telephone call merely to protect his girlfriend so she would not have to "go through this anymore." But this argument drew scant sustenance from the evidence that was presented to the jury. Indeed, even as a mere possibility, the suggestion was a highly incredible one

and, at the very least, was inconsistent with the rest of defendant's behavior during the investigation and its aftermath, as it was presented to the jury. For example, if defendant truly had sought to protect his girlfriend from suspicion for the murder, why would he admit his guilt to her but deny it to the police? Consequently, defendant's argument on this score not only failed to impress either the jury or the trial justice, but it also leaves us similarly unpersuaded.

▮ We have repeatedly held that in deciding a motion for a new trial, the trial justice must determine "whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt." *State v. Scurry*, 636 A.2d 719, 725 (R.I.1994). In making this decision, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994). If the trial justice has "articulated an adequate rationale for denying a motion," *State v. Bleau*, 668 A.2d 642, 646 (R.I.1995), his or her ruling on a new trial motion will be accorded great weight on appeal. *State v. Dame*, 560 A.2d 330, 332 (R.I.1989). Nevertheless, we shall overturn a ruling on a motion for a new trial, if the justice overlooked or misconceived material evidence or was otherwise clearly wrong. *State v. Rieger*, 763 A.2d 997, 1002 (R.I.2001); *Scurry*, 636 A.2d at 725.

Given the importance that the trial justice and, quite evidently, the jury placed on the defendant's uncoerced, but apparently candid admission of guilt in his telephone call to Simpson, we cannot say that the justice overlooked material evidence by failing to mention the testimony of any defense witness when he denied the defen-

dant's motion for a new trial. Even if the trial justice had believed the defense's witnesses, their aggregate testimony did not overcome, negate, or diminish the damning effect of the defendant's recorded admission to having committed the murder after Mrs. Picard had surprised him while he was pilfering her apartment for drug money. Consequently, we cannot say that the trial justice overlooked material evidence or otherwise reached an erroneous conclusion when he denied the motion for a new trial.

## Conclusion

For these reasons, we affirm the conviction and deny the appeal.