**STATE**

v.

**Michael P. TATRO.**

No. 94–204–M.P.

Supreme Court of Rhode Island.

May 25, 1995.

Jeffrey Pine, Atty. Gen., Annie Goldberg, Sp. Asst. Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Michael Tatro, Pro Se.

## OPINION

SHEA, Justice.

This matter came before the Supreme Court following our granting the petition for the issuance of a writ of certiorari issued to the Superior Court of Kent County on the pro se petition of the defendant, Michael P. Tatro (Tatro), to review an adjudication that the defendant had violated the conditions of a previously suspended sentence. The hearing justice ordered removal of the suspension of the defendant's eight year remaining term in the case. The defendant has attacked this adjudication of violation on the grounds that evidence was improperly received, that his cross-examination of a witness was impermissibly limited, and that the removal of suspension improperly exceeded the sentencing benchmarks. For the reasons set forth below, we affirm the adjudication of violation.

It is necessary to review the correctional history of this defendant in order to fully appreciate the circumstances surrounding the adjudication at issue. The defendant had pleaded nolo contendere in April 1990 to a single charge of obtaining over $500 under false pretenses. He was sentenced to a term of ten years' imprisonment at the Adult Correctional Institutions, with two years to serve, eight years suspended, and the imposition of eight years' probation.

In 1989, Tatro had pleaded three times to a number of other outstanding charges. Each of these charges involved various types of larcenous fraud. On February 7, 1989, defendant pleaded nolo contendere to three counts of forgery and counterfeiting for which he received concurrent sentences of three years' probation on each count. The next pleas were entered on September 15, 1989 and involved three separate sets of offenses allegedly committed in March, June, and July of 1989. For the first offense of uttering a fraudulent check for under $1,000, defendant received a sentence of one year to serve. The second set of offenses included three counts of forgery and counterfeiting whereby defendant received a sentence of seven years, eighteen months to serve, sixty-six months suspended; uttering a fraudulent check in an amount over $1,000 for which defendant received a sentence of seven years, eighteen months to serve, sixty-six months suspended; uttering a fraudulent check for under $1,000 for which defendant received a sentence of one year to serve; and obstructing a police officer, for which he received a sentence of one year to serve. The third offense of two counts of uttering fraudulent checks under $1,000 resulted in a sentence of one year for each count. The defendant's sentences for these offenses were concurrent.

Finally, on October 4, 1989, defendant again pleaded nolo contendere to a charge of obtaining money in an amount over $500 by false pretenses for which a five-year suspended sentence was imposed with five years' probation. In addition, a criminal information also charging defendant with obtaining money by false pretenses in an amount over $500, allegedly committed on June 11, 1989, was voluntarily dismissed by the state.

After the defendant's nolo contendere plea was entered in April 1990, defendant was allowed to plead nolo in four new cases. These cases were disposed of on two separate dates in January 1991. The first group was heard on January 7th and comprised three different informations including a nine-count Providence case and two Kent County cases. All counts involved bad checks, forgery and counterfeiting, obtaining money by false pretenses, and, in two cases, conspiracy. Nine concurrent ten-year sentences were imposed in the Providence case, each with thirty months to serve, ninety months suspended. In the Kent County cases, defendant received three ten-year sentences, with ninety months suspended in each, plus a two-year sentence, all of which were to run concurrently.

The second group was heard sixteen days later on January 23, 1991. Once again, defendant pleaded nolo contendere to three more counts of obtaining money in an amount over $500 by false pretenses, and one count of conspiracy. The defendant received four concurrent ten-year sentences, thirty months to serve, ninety months suspended, with ninety months' probation to commence on release.

Two more cases against defendant were disposed by pleas. This occurred on March 2, 1992. One involved an escape from custody on November 27, 1991 for which defendant was sentenced to five years, one year to serve and four years suspended. This sentence was to run consecutively with the sentences already being served. The other case charged defendant with uttering two bad checks in an amount over $1,000 for which he received concurrent sentences of two years and one year, both suspended, with probation.

On April 29, 1992, defendant again pleaded nolo contendere to an eight-count information charging him with six counts of uttering bad checks in an amount under $1,000; one count of uttering a bad check in an amount over $1,000; and one count of obtaining money in an amount over $500 by false pretenses. For these charges, Tatro received concurrent suspended sentences on all counts, with probation of one year on each of the checks under $1,000, two years probation for the check of over $1,000, and five years probation on the false pretenses charge.

It was while defendant was serving a four and a half-year sentence at the Adult Correctional Institutions that he orchestrated and conducted, from the ACI, a wide-ranging credit card fraud scheme which led to a forty-four count information. The charges filed on January 19, 1993 included: one count of conspiracy; one count of dealing in the credit cards of others in violation of G.L.1956 (1981 Reenactment) § 11–49–3; nine counts of fraudulent use of credit cards in value over $100 in violation of G.L.1956 (1981 Reenactment) § 11–49–4; seven counts of receipt of money or goods or services with a fraudulent credit card in violation of G.L.1956 (1981 Reenactment) § 11–49–7; twenty-five counts of computer crime under G.L.1956 (1981 Reenactment) § 11–52–2, as amended by P.L. 1983, ch. 246, § 1; and one count of receipt of stolen goods valued under $500 under G.L.1956 (1981 Reenactment) § 11–41–2.

At his probation-revocation hearing, conducted in May 1993, pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, the trial justice adjudged defendant to be a "violator of a previously imposed sentence" and ordered the suspension of the eight year remaining term in that case removed. The case was the April 1990 single charge of obtaining money under false pretenses in an amount over $500 for which defendant had been sentenced to ten years' imprisonment at the ACI, only two years of which were to be served, with the remaining eight years suspended, with the imposition of eight years' probation.

The defendant's primary issue on certiorari is that "hearsay" evidence was impermissibly allowed at his violation hearing through the testimony of two of the state's three witnesses, Warwick Detective Scott McKnight (McKnight) and co-defendant Deborah Medeiros (Medeiros). Tatro, relying on *State v. DeRoche*, 120 R.I. 523, 389 A.2d 1229 (1978), argues that he should have been allowed to confront and cross-examine each and every witness referred to by both McKnight and Medeiros.

This court has stated that before admitting evidence at a violation hearing, especially concerning issues "which are central to the determination of the commission of the violation, the trial justice must determine whether there is good cause for denying confrontation and/or cross-examination." *DeRoche,* 120 R.I. at 533, 389 A.2d at 1234; *see State v. Koliscz,* 623 A.2d 452, 452–53 (R.I.1993). However, in both *DeRoche* and *Koliscz,* hearsay was virtually the only evidence offered of a violation. In *DeRoche,* revocation of probation "was based primarily upon a hearsay statement taken by a state police detective sergeant from an alleged accomplice," 120 R.I. at 524, 389 A.2d at 1230, who did not testify; instead a notarized statement, typed by the detective and signed by the alleged accomplice, was introduced "and constituted the major portion of the evidence relied upon by the trial justice in finding defendant to be a violator." *Id.* at 525, 389 A.2d at 1230. Likewise, in *Koliscz,* "admission of a hearsay statement of a wife who was never produced to give testimony" was found to have "constituted reversible error" in the absence of a specific finding of good cause for the nonproduction of a living witness. 623 A.2d at 452.

In the instant case, the "hearsay" testimony to which defendant objects came primarily through McKnight who had recounted the steps he took in investigating what eventually led to the multiple charges. McKnight testified about the way in which he had become involved in a credit card scam investigation. He recounted how the Warwick Police Department had been notified by employees at the Mail Box Etc. business on Warwick Avenue of a possible credit card scam they believed was taking place. These employees informed McKnight that the individual involved in the alleged scam would be coming to Mail Box Etc. to pick up a package or a letter. Upon receiving this information, uniformed officers proceeded to the location given and the ensuing investigation resulted in the apprehension of a female named Gail Shoemaker. This female was in the process of picking up an envelope addressed to Phyllis Cecere (Cecere).

The officer testified that Cecere "had contacted the patrolman who was also located at the Mail Box Etc. and had advised the officers that she did not—." It was at this point that the first objection to hearsay was lodged and overruled. A new question was put to the officer. He was asked whether there came a time when he received information about a particular suspect. McKnight answered in the affirmative and testified: "I received what was a general broadcast. It was put out to watch for a maroon colored Cutlass Supreme being driven by a female, Deborah Medeiros, who's described as heavy set and frizzy hair." McKnight then went on to testify how he went to the location and saw a woman of that description getting out of the vehicle described. He approached this woman. The next objection came after McKnight answered a question about whether the woman identified herself. McKnight responded to this question in the following manner: "She identified herself as Deborah Medeiros." Defense counsel's objection to this testimony was overruled.

The same objection was lodged by defense counsel and overruled twelve more times during McKnight's direct testimony. As indicated by the record, some of these either were simply not hearsay at all or were within recognized exceptions to the hearsay rule. As an example, in explaining how he happened to find "in plain view a credit card in the name of Dennis McCathe," McKnight testified that when he asked Ms. Medeiros for her car registration, "[s]he stated to me that the registration was in the glove compartment of the vehicle." This testimony was not hearsay. It was not offered to prove the truth of the matter asserted, but to show what prompted McKnight to open the compartment where he found other relevant information.

McKnight thereafter recounted that in the glove compartment he found car loaner agreements and registration documents for plates later determined to "come back to Michael Tatro." This statement was also objected to by defense counsel based both on hearsay and the best evidence rule. Once again, this evidence was elicited not for its truth, that is whether the plates were actual-

ly traceable to defendant, but was merely one detail in McKnight's account of the developing investigation. The statement was not hearsay. While it is obvious that the registration, if relevant at all, could have been introduced through the custodian of the records under the rules governing the authentication of secondary evidence or the exception to the hearsay rule for public records, it was not necessary to do so.

█ The next objection came in response to a question about Medeiros's comment at the police station, after being advised of her rights and told of the investigation into a "credit-card fraud and an ATM fraud." McKnight testified that Medeiros stated "the ATM cash advances were mine but I had nothing to do—I'm not discussing the scam without a lawyer." It must be emphasized that Medeiros was a co-conspirator who testified at hearing. In *Richardson v. Marsh*, 481 U.S. 200, 201, 107 S.Ct. 1702, 1704, 95 L.Ed.2d 176, 182 (1987), the United States Supreme Court stated that while it has been "held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial," that is clearly not the situation in the instant case. This was not a trial. Nor was this a joint trial. The statement, though facially incriminating of Medeiros, did not implicate defendant; in fact, it was an admission against her own penal interest and did not prejudice this defendant. Most important is the fact that since Medeiros herself testified, she was subject to cross-examination.

Before the next objection was raised, McKnight went on to testify, without objection, to a conversation with an individual named David McDonald, regarding notebooks seized in a search pursuant to a warrant that contained "his name, as well as his wife's name of Debra McDonald, their home address, their credit card number, their social security number" and what was later determined to be the "maiden name of one of their mothers," which McKnight said led him to begin "to contact victims from the list in the notebook." It was the very next question that defense counsel objected to regarding "the substance of" a conversation concerning the purchase of Rolex watches. McKnight answered that "[t]he McDonalds advised me they had never made any purchases or authorized purchases of Rolex watches on their credit card." Before the objection was posed, McKnight further testified that he did ask of the McDonalds about any clothing orders and that they had not authorized any such orders. The objection came immediately upon the heels of McKnight's answer, was overruled, and there was no motion to strike.

The next group of objections were all regarding questions put to McKnight that concerned out-of-court statements made to him by witnesses who did not testify at the adjudication hearing. The testimony objected to by defense counsel was as follows: (1) that a witness, Gary Hyslop, told McKnight "he neither authorized nor made the purchase * * * of any Rolex watch or watches" but "that some weeks previous to that he had received a call from the operator who indicated that a man had located his wallet and would like him to contact them, and gave him a phone number to call." McKnight further testified that Mr. Hyslop had returned the call "and the gentleman on the other end of the line advised him that he had found his wallet and read off some information to him," but "Mr. Hyslop advised him that he had not lost his wallet" and the conversation "terminated after that point"; (2) that another nontestifying witness, Diane Henault, told McKnight that "neither she nor her husband purchased or authorized the purchase of Rolex watches on their credit card" but that she too had "received a call from a male caller" and this time she was advised "that he was from the credit card fraud company." This witness believed this to be factual and supplied the caller with information he had requested "to verify who in fact she was." This information included her social security number, date of birth, and her mother's maiden name; (3) that yet another witness, Edward Sohner, told McKnight that he was staying at a Massachusetts hotel undergoing renovation and that the room phones were not in operation; that the clerk at the hotel "approached him at his room and advised him that he had a phone call from his credit card security company * * * and that the

caller would call back in ten minutes"; that Sohner went to the hotel desk to receive the call and "the caller identified himself as being from the Visa Security Division" and "supplied him with his account number and balance," advising "that he believed his card was lost or stolen" and asking Sohner "to verify who, in fact he was, which he then supplied;" and that Sohner told McKnight "he had neither made nor authorized the purchase of any Rolex watches on his credit card"; (4) that in regard to the delivery of the Rolex watches charged to Mr. Sohner, McKnight spoke to someone at a jewelry company, whose name escaped his memory, who told him their records indicated the watches "were to be delivered for their twin son[s'] birthday of the Sohners."

Suffice it to say that none of the above testimony directly linked defendant, of course, since no "male caller" was ever specifically identified. The identification information came in through the testimony of prosecution witness Deborah Medeiros, who testified at the adjudication hearing that she was introduced to an individual named John Tallo, an inmate at the Adult Correctional Institutions (ACI), while visiting her brother, Joseph Shute, also an inmate at the ACI. She testified that after that, in July of 1992, John Tallo (Tallo) placed a collect phone call to her, proposing that she assist him and Michael Tatro in running a credit card scam. She elaborately testified how, at Tallo's request, she rented a vacant apartment next to her own and arranged to have phone lines installed, after which defendant Tatro directed implementation of an automated answering system and three-way calling, on a cordless phone which was leased by her from a West Warwick, Rhode Island rental center. She further testified that, thereafter, Tatro, from the ACI, would place a collect call to her at her apartment, which she would accept, and that she would then place "calls to various businesses for him" at telephone numbers he would supply to her. She would place his call on hold until she reached the other party whereupon she would depress the hold button and bring Tatro back on line where he would then do the talking.

She specifically testified to instances in which "Tatro would call and [say] he was [the] Visa–Master Card Authorization center, and a lost or stolen credit card had been processed through their computer, and he wanted the last Visa or Master Card that went through their little computer over there, and that's how we obtained the credit card numbers." They would "then call the individual people after we got their names and addresses" and would obtain "personal information from them" such as "[s]ocial security number and mother's maiden name and date of births." Once having obtained this pertinent information, they were then free to make purchases by telephone that were charged to the credit cards.

In one instance, Medeiros told of a call that she and Tatro placed to a bank that had issued a Master Card in the name of one William Purro. Tatro "reopened an account and had another card issued on it" in a new name, that of "Dennis McCathe." Tatro then had Medeiros fill out a card to stop the mail so that cards would not be delivered to the holder's house so that "we [Tatro and Medeiros] could catch them first." Medeiros testified that she then "made out a note for [herself] to go pick up his mail." Tatro had Medeiros use the card for cash advances which totalled "[b]etween sixteen hundred and two thousand dollars," all drawn from automatic teller machines at "Fleet Bank in Apponaug, in Warwick, Greenwood Credit Union in Warwick, and Hospital Trust in Warwick."

Medeiros testified to another instance in which Tatro called a woman named Phyllis Cecere and "offered her a new credit card from Discovery at a no annual fee basis." Cecere "released all personal information" to Tatro and Medeiros and they then obtained the balance "on her [Cecere's] American Express Optima card," which they then used to make purchases in her name. These purchases, testified Medeiros, included nine hundred dollars in traveler's checks. Medeiros testified that she "was instructed by Mr. Tatro to split the money three ways" and to deposit one-third each to Tatro's and John Tallo's ACI inmate accounts, keeping the other third for herself.

Another card holder, Gary Hyslop, was discovered, according to Medeiros's testimony, in a similar manner via a telephone call placed to a Cumberland Farms store. The credit account subsequently obtained was used to order Rolex watches by telephone from a company in New York. The watches were then delivered to a postal box set up at Tatro's direction at Mail Box Etc., a mailing center, on Warwick Avenue in Warwick, Rhode Island. Upon receipt of the watches, Tatro had instructed Medeiros to sell them to a Providence jeweler for "[b]etween a thousand and twelve hundred" dollars each. Medeiros testified that Tatro told her once again "to split the money three ways" and she was to deposit one-third each to Tatro's and Tallo's ACI accounts, keeping a third for herself. Medeiros further testified to using the Rolex scam, at Tatro's insistence, through other card holders, including the Henault family, David McDonald, Edward Sohner, and Michael Picozzi. Medeiros informed the trial justice that the McDonald card was also used to order purchases of men's clothing. McKnight testified that McDonald's name and some personal and credit information was found in notebooks seized in a search of Medeiros's apartment upon a warrant.

This was the full extent and nature of defendant's ingenious credit card scam. Medeiros told the court she decided to withdraw from the operation because Tatro had proposed that they "open a business up" and "run it out of an office" upon his release from the ACI. He went so far as to suggest they call the new business venture "JMD Productions." The "J" would stand for John Tallo, "M" for Michael Tatro and the "D" for Deborah Medeiros. The defendant suggested, humorously, that they consider calling their business, "Screw–U, Enterprises." Medeiros testified that she "didn't want to get involved, not for something that big."

■ It is the opinion of this court that every statement elicited during the testimony of Detective McKnight, alleged to be "hearsay" by defendant, was offered, not as substantive proof of the violation, but to provide background for the testimony of prosecution witness Deborah Medeiros. And Medeiros's non-hearsay testimony alone would have sufficed for a finding of violation. In Rhode Island, "the state is not required to prove a violation beyond a reasonable doubt; rather, the violation need only be established by reasonably satisfactory evidence." *State v. Bourdeau,* 448 A.2d 1247, 1249 (R.I.1982). It is in this respect, regarding the standard of proof that the instant case is plainly distinguished from *DeRoche* and *Koliscz.* In these latter two cases no other evidence but the hearsay evidence was presented to support the violation.

■ Here, in the instant case, in addition to the testimony of Deborah Medeiros, the state presented a third witness, Warwick Detective Sergeant Kerry O'Rourke, who was in charge of the investigation and who testified without objection that certain items seized in her execution of a warrant to search Medeiros's apartment and rental car included records showing withdrawals of nine hundred dollars' worth of American Express Traveler's Checks. These checks were withdrawn using the automatic-teller-machine cards in the names of William Purro, then an inmate at the ACI, and Dennis McCathe, a fictitious name. Detective Sergeant O'Rourke also testified regarding the taking of Medeiros's lengthy statement.

The record reveals, through statements made by the prosecutor at the close of the state's case, that there were many other witnesses the state could have called, revealing much more admissible evidence. However, it was abundantly clear that the non-hearsay evidence presented at the adjudication hearing was clearly sufficient to "establish the violation by reasonably satisfactory evidence." *State v. Olsen,* 610 A.2d 1099, 1103 (R.I.1992); *In re Lamarine,* 527 A.2d 1133, 1135 (R.I.1987).

■ We have never held that the mere admission of hearsay testimony at an adjudication hearing requires reversal of a finding of violation. As a matter of fact, admission of hearsay testimony at a criminal trial, while error, is not necessarily prejudicial to a defendant's cause thereby necessitating reversible error. *See State v. Cole,* 500 A.2d 531, 532–33 (R.I.1985). The decisions in *DeRoche*

and *Koliscz* do not forbid the use of hearsay evidence altogether at an adjudication hearing. These decisions only require the trial justice to first determine there was good cause for denying "confrontation and/or cross-examination" on issues "central to the determination of the commission of the violation * * * ." *Koliscz,* 623 A.2d at 452–53 (quoting *DeRoche,* 120 R.I. at 533, 389 A.2d at 1234).

In the instant case, the issues which were " 'central to the determination of the commission of the violation' " were clearly resolved by evidence other than hearsay evidence. We are of the opinion that the trial justice did not base his conclusion on the testimony of Detective McKnight, whether it was hearsay or otherwise, but on the non-hearsay testimony of Deborah Medeiros and Detective Sergeant O'Rourke. This conclusion is evident from the trial justice's stated findings:

"The facts in this case have been vividly presented to the Court through the testimony of Miss Medeiros, who has admittedly been offered a sentence [of] less than jail by the State's Attorney * * * in order to give testimony implicating the other people involved in this so-called scam. She has done so forthrightly. She has withstood a lengthy cross-examination by Mr. Tatro's counsel * * * and her ingenuousness has been established to this Court's thinking without any question. She admitted to being herself incarcerated at times. She admits having been engaged in the imbibing in drugs at times, and more importantly, she admits being involved with this defendant, Mr. Tatro, and Mr. Tallo, herself, and another woman that she used as a runner.

"[T]his court finds that based upon the evidence offered to the Court up to this juncture, with respect to the Medeiros testimony and also the forthrightness of the testimony of Detective Sergeant O'Rourke, who is in charge of this entire operation as far as the investigatory phase was concerned, the Court is reasonably satisfied that this defendant did in fact violate the terms of his suspended sentence and probation. And the Court so finds."

The defendant also alleges that he was denied the opportunity to cross-examine "each and every witness" mentioned by McKnight and Medeiros. That was not defendant's right. We have consistently held that "[t]he process due for probation-revocation hearings is less formal than the full panoply of rights afforded at a criminal trial." *State v. Desrosiers,* 559 A.2d 641, 643 (R.I.1989) (citing *Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 1759–60, 36 L.Ed.2d 656, 661–62 (1973); *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). What is required are the "minimum due-process requirements": "notice of the hearing, notice of the claimed violation, the opportunity to be heard and present evidence in defendant's behalf, and the right to confront and cross-examine the witnesses against defendant." *State v. Bourdeau,* 448 A.2d at 1249 (citing *Morrissey v. Brewer,* 408 U.S. at 489, 92 S.Ct. at 2604, 33 L.Ed.2d at 499). This language refers to witnesses at the adjudication hearing. Nothing requires the state at an adjudication hearing to present every witness it expects to produce at trial, as long as the testimony presented meets "the less stringent reasonably-satisfactory-evidence standard required for a probation-violation hearing." *State v. Olsen,* 610 A.2d at 1104. The testimony presented in the instant case clearly met this less stringent standard.

In an appeal from adjudication of violation this court's review is limited to determining whether the trial justice acted arbitrarily or capriciously in finding a violation. *State v. Koliscz,* 636 A.2d at 1330. In this case, sufficient, indeed ample, evidence was presented that defendant not only "violated the implied condition of good behavior attached to the suspended sentence," *State v. Jacques,* 554 A.2d 193, 195 (R.I.1989), but the evidence presented showed that defendant established and conducted from the ACI a large-scale credit-card-fraud scheme involving the commission of numerous other criminal offenses. There is absolutely nothing in the record of this hearing that would lead us to believe that the trial justice acted arbitrarily or capriciously. The record in this case makes it quite clear that he did not act

arbitrarily or capriciously. The defendant's attack on this ground is entirely without merit.

The defendant's second claim of error alleges a violation of his Sixth Amendment rights under the United States Constitution in the sustaining of objections to defense counsel's cross-examination of prosecution witness Deborah Medeiros.

 The state objected to an inquiry involving Medeiros's use of drugs, "prior to her conversation with [John] Tallo in the Summer of '92," when she had said she was initially approached about participating in the credit-card scam. The state's objection was sustained. Defense counsel was permitted to cross-examine Medeiros fully as to her use of drugs at the time of the conversation and afterwards. Additionally, defense counsel was permitted to cross-examine Medeiros about her statements to Detective Sergeant O'Rourke regarding her drug use and activity. Furthermore, Medeiros's own attorney was called and apparently instructed Medeiros not to answer questions concerning the sale and delivery of drugs, based upon her privilege against self-incrimination. It is quite apparent there was no impermissible limitation on defendant's Sixth Amendment right to cross-examination of the state's witness.

The defendant's final argument on certiorari alleges error in the decision of the trial justice, upon a finding of violation of probation, to remove the suspension of sentence formerly imposed on defendant's plea of nolo contendere in K2/90–185A to obtaining money by false pretenses in an amount over $500. Tatro argues that the sentence originally imposed in that case, ten years' imprisonment at the ACI, two years of which were to be served with the remaining eight years suspended, was "clearly excessive" under the "Sentencing Benchmarks." The defendant seeks to vacate this sentence.

 General Laws 1956 (1981 Reenactment) § 12–19–14, as amended by P.L.1982, ch. 215, § 1 governs revocation of the suspension of sentence after a violation. This statute provides in pertinent part:

"Whenever any person, who shall have been placed on probation by virtue of the suspension of execution of his sentence * * * shall violate the terms and conditions of his probation as fixed by the court * * *. * * * The court shall conduct a hearing to determine whether the defendant has violated the terms and conditions of his probation, at which hearing the defendant shall have the opportunity to be present and to respond. Upon a determination that the defendant has violated the terms and conditions of his probation the court, in open court and in the presence of the defendant, may revoke the suspension and order the defendant committed on the sentence previously imposed, or on a lesser sentence, or may continue the suspension as to said court may seem just and proper."

It is somewhat surprising that a defendant with this lengthy criminal record would suggest he was ever treated with anything less than lenience. We would point out to him that the original charge for which the defendant received the eight-year suspended sentence was not before the trial justice at the probation-violation hearing. Rather, since the statute permits, on a finding of violation, exactly what was ordered in this case, the only remaining question is whether the trial justice acted arbitrarily or capriciously in making that determination. We have determined that he did not.

For the foregoing reasons the defendant's petition for certiorari is denied, the writ previously issued is quashed, the adjudication of violation is affirmed, and the papers of the case are remanded to the Superior Court with our decision endorsed thereon.

BOURCIER, J., did not participate.