**STATE**

v.

**John R. PACHECO, Jr.**

**No. 2000–6–C.A.**

Supreme Court of Rhode Island.

Jan. 3, 2001.

Virginia M. McGinn, Aaron L. Weisman, Providence, for Plaintiff.

Susan B. Iannitelli, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on appeal by the defendant, John R. Pacheco, Jr., from a judgment of conviction of one count of first-degree murder, one count of conspiracy to commit murder, and on application for reduction of his sentence. The defendant, after a jury trial in Superior Court, was sentenced to life imprisonment without the possibility of parole for murder committed with aggravating circumstances and to ten years consecutive incarceration for conspiracy to commit murder. We affirm.

### Facts and Procedural History

At approximately 9:45 a.m. on November 18, 1995, a fisherman discovered the body of seventeen-year-old Jenny–Lee M. Bailey (Bailey or victim) on the shore of Gorton's Pond in Warwick, Rhode Island. Her body was supine and a large amount of blood was found on her face and neck. The details of the state medical examiner's testimony describing the brutality of the murder are summarized below in our discussion of the issues raised on appeal. The autopsy also revealed that at the time of her death, Bailey was approximately sixteen weeks pregnant.

On the day before Bailey's body was discovered, defendant was living at 60 Curson St. in West Warwick, Rhode Island, with Jonathan Tretton (Tretton), Tretton's girlfriend Tanya Casala (Casala), their friend Christopher King (King), and King's mother, Mary Raleigh. Casala, the prosecution's prime witness at trial, gave extensive testimony over three days during which she related the following account of the events surrounding Bailey's murder. Casala testified that on the afternoon of the murder, Tretton told her that they would be leaving that evening for a trip to New York City. While Casala was packing their bags, Tretton and King had a conversation in the living room.

According to Casala, defendant returned to the house at 60 Curson St. between 6 and 6:30 p.m. He asked whether Tretton was ready, directed him not to place the bags into the car at that time, but to get dark clothing. Casala observed that after Tretton had dressed in black jeans, a black muscle shirt, and a black Notre Dame jacket, defendant and King searched for a knife in the living room. Once the knife was found, Casala watched defendant sharpen it for several minutes. She testified that Tretton and defendant then went towards the kitchen and, after a few minutes, returned with a window weight,[1] which defendant told Casala was "to bonk people over their heads." Casala heard defendant ask King for "the pregnant bitch's number," after which defendant called Bailey, told her to meet him "where I fish" at a quarter-to-ten, then made a second call and instructed Bailey not to tell anyone about the meeting. Later in the evening, Tretton told Casala that he had "a job" to kill someone, an act for which he would be paid $1,000, a car, and employment, but he intended only to "beat the person up."

Casala further testified that defendant told Tretton, who was carrying the window weight and a supermarket bag containing pink sweat pants, that he would drop Tretton off at Gorton's Pond while defendant visited his girlfriend, Erin Sweeney (Sweeney).[2]

---

1. A window weight was recovered from Gorton's Pond, and the medical examiner testified at trial that the laceration to the back of the victim's head was consistent with having been made by the window weight.

2. Erin Sweeney had a son with defendant. According to testimony by Casala, defendant was worried that Sweeney would return with the baby to New York if she learned that Bailey was made pregnant by defendant.

Casala testified that she was at the house with King when defendant and Tretton returned about an hour later. She noticed that Tretton was now clad in the pink jogging pants, and she heard defendant ask King whether he had seen all the blood on Tretton's hands, and she further heard defendant tell him that Tretton's jeans had been drenched in blood.[3] Casala related that she was upset after defendant left and that Tretton comforted her by saying that he had done it for her so that Tretton could support her with a new job and a place with heat.[4] Casala further stated that, when defendant returned, he told her to "calm down and not look at Jay (Tretton) as a murderer, that he was just doing a friend a favor, that he would have done the same for him," and that if she really wanted something to cry about, defendant would take her to the body.

Casala also testified in detail about a conversation she had with Tretton that night, in which Tretton told her that he had met Bailey at the pond, talked to her for a while and then hit her over the head with the window weight as they were walking. When Bailey asked him why he was doing this to her, Tretton allegedly responded "because he had to." Tretton told Casala that he hit Bailey again, sliced her throat, stabbed her, then threw the knife and window weight into the pond.

The defendant's motion for separate trials was granted. Casala and King testified at the trial, and defendant took the stand in his own defense. King's testimony supported that of Casala in many significant details, although not totally, because King frequently was reluctant to answer, and he contradicted his earlier statements to police, explaining that he had tried "to save my friend [Pacheco]" and was "scared [of] going to jail." A jury found Tretton guilty of first-degree murder and conspiracy to commit murder, and

he was sentenced to life imprisonment. The defendant was found guilty on the same counts, but the jury in his case also found that several of the aggravating factors set forth in G.L.1956 § 11–23–2 were present. The defendant's motion for a new trial was denied. At a presentence hearing pursuant to G.L.1956 § 12–19.2–1, both sides presented additional evidence relevant to sentencing. On March 8, 1999, defendant was sentenced to life imprisonment without the possibility of parole and ten years incarceration for conspiracy, to run consecutively.

On appeal, defendant argued that the trial justice committed reversible error when he allowed Casala, a prosecution witness, to testify about statements made by Tretton, defendant's coconspirator, and then refused to pass the case. Second, defendant maintained that the trial justice erred when he failed to instruct the jury to determine whether a conspiracy existed, before considering the statements of the coconspirator as proof of defendant's guilt. Third, defendant argued that because the jury in his coconspirator's separate trial had found no aggravating factors, the state was barred by the doctrine of collateral estoppel from seeking a sentence of life imprisonment without the possibility of parole in the present case. Finally, defendant appealed his sentence of life imprisonment without parole pursuant to § 12–19.2–5. For the reasons stated herein, we affirm defendant's conviction and sentence.

### Admission of Hearsay Testimony

The first question before us is whether the judge erred in admitting Casala's testimony, relating what Tretton and defendant discussed before the murder and Casala's reports of what Tretton said following the murder. The defendant argued that Casala's testimony relating what Tretton told her before the murder about

3. A shell fisherman found a pair of blood-stained black jeans by the side of the road. The supervisor of the forensic biology section at the Rhode Island Department of Health laboratories testified that the blood was found to be consistent with Bailey's blood.

4. Casala was pregnant by Tretton at the time.

their planned trip to New York, Tretton's informing her that defendant wanted them to return to Curson St., and Tretton's account of what was required of him and the rewards he would receive, was not against penal interest and therefore, should not have been admitted under Rule 804(b)(3) of the Rhode Island Rules of Evidence. The defendant also challenged the admission into evidence of Casala's testimony describing defendant's statements to Tretton not to pack the car immediately, to get dark clothing, and defendant's arrangement to meet Bailey at Gorton's Pond.

■ The state argued that objections were made to only three of Casala's statements and that because no bases for the objections were specified, the issues were waived and cannot now be raised on appeal for the first time. "According to our well-settled 'raise or waive' rule, issues that were not preserved by a specific objection at trial, 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.'" *State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I.1999) (quoting *State v. Toole*, 640 A.2d 965, 972–73 (R.I.1994)). Thus, any allegations that errors were committed at trial are considered waived unless they were effectively raised at trial, irrespective of whether the objections were raised at the appellate level. *Id.*

Assuming without deciding that defendant had raised or substantiated his objections in a timely manner to preserve them for our review, the issues now raised on appeal are without merit. Statements made by defendant in Casala's presence were clearly against his own interest, particularly when considered together with the events that took place. Pursuant to Rule 804(b)(3), evidence is admissible as an exception to the hearsay rule if the declarant is unavailable as a witness, and if the evidence is determined to be

"[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant

to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Here, Tretton, defendant's coconspirator, was unavailable because he availed himself of his Fifth Amendment right not to testify. "Rule 804(a)(2) defines 'unavailability as a witness' to include situations in which the declarant 'persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so.'" *State v. Grossi*, 588 A.2d 607, 608 (R.I.1991) (per curiam). Although the statements that defendant made to his coconspirator in Casala's presence may individually not have been inculpatory, the testimony *in toto* was clearly repugnant to defendant's interest. Therefore, the trial justice was correct in admitting them. Even assuming that the hearsay evidence was improperly admitted, its admission does not automatically require reversal. *State v. Burns*, 524 A.2d 564, 568 (R.I.1987). Rather, we examine the hearsay testimony to determine the probable impact it may have had upon the fact finder. *Id.* "[A]dmission of hearsay testimony at a criminal trial, while error, is not necessarily prejudicial to a defendant's cause thereby necessitating revers[al] * * *." *State v. Tatro*, 659 A.2d 106, 113 (R.I.1995); *see State v. McKone*, 673 A.2d 1068, 1075 (R.I.1996) (finding that harmless error occurred when other direct or indirect evidence supported the challenged testimony). Although certain statements allegedly made to Casala by defendant's coconspirator before the murder did not clearly inculpate defendant when viewed individually, defendant's own statements and actions that evening were inculpatory, repugnant to his self-interest, and provid-

ed more than sufficient evidence to support his conviction.

### Inculpatory Statements Made after the Murder

■ In his appeal, defendant also challenged the incriminating, out-of-court statements made by his coconspirator after the murder, when the conspiracy had ended, on the basis that he was denied his right to cross-examination guaranteed by the Confrontation Clause of the United States Constitution. The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides to the accused the right " 'to be confronted with the witnesses against him [or her].' " *State v. Correia,* 600 A.2d 279, 286 (R.I. 1991). We have held repeatedly "that the right to cross-examination is guaranteed by the confrontation clause of the Sixth Amendment." *Id.* (quoting *State v. Dame,* 488 A.2d 418, 423 (R.I.1985) and citing *State v. DeBarros,* 441 A.2d 549, 552 (R.I. 1982)). Moreover, article 1, section 10, of the Rhode Island Constitution guarantees to a defendant the right of confrontation, although that right does not bar the admission of all hearsay evidence. *Correia,* 600 A.2d at 286 (citing *State v. Manocchio,* 497 A.2d 1, 7 (R.I.1985), *cert. denied,* 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991)); *see Dutton v. Evans,* 400 U.S. 74, 80, 91 S.Ct. 210, 215, 27 L.Ed.2d 213, 222 (1970) (holding that the defendant's right of confrontation was not denied by coconspirator's statement as related by witness, when independent indicia of reliability were present).

■ When a confrontation is not possible because the declarant of a proffered out-of-court statement is not available, we must engage in a case-by-case analysis to determine whether the right of confrontation of the accused has been violated. *Correia,* 600 A.2d at 286 (citing *Manocchio,* 497 A.2d at 7–8). In *Manocchio,* 497 A.2d at 8, we adopted the test set forth in *Dutton,* as clarified in *Mancusi v. Stubbs,*

408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293, 301 (1972). "The focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant.' " *Manocchio,* 497 A.2d at 8 (quoting *Mancusi,* 408 U.S. at 213, 92 S.Ct. at 2313, 33 L.Ed.2d at 301). Reliability can be inferred, without more, in a case in which the evidence falls within a firmly rooted exception. In other cases the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness. *State v. Burke,* 574 A.2d 1217, 1222 (R.I.1990) (citing *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980)).

■ This Court has upheld the admission of hearsay statements of a coconspirator under the authority of *Dutton,* in *State v. Bracero,* 434 A.2d 286, 289 (R.I.1981), and in *State v. Lerner,* 112 R.I. 62, 82–84, 308 A.2d 324, 338–39 (1973). Moreover, in *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), the Supreme Court permitted the out-of-court confession of the defendant's coconspirator when he refused to testify at the defendant's trial. The Court stated that Rule 804(b)(3), under which the statements at issue in that case were admitted, was "founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson,* 512 U.S. at 599, 114 S.Ct. at 2435, 129 L.Ed.2d at 482. "The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." *Williamson,* 512 U.S. at 603–04, 114 S.Ct. at 2437, 129 L.Ed.2d at 478. Our Rule 804(b)(3)—identical to the

Federal Rule—has recognized statements against interest as an exception to the hearsay rule as early as 1909 in the case of *Tiffany v. Morgan*, 73 A. 465 (R.I.1909) (per curiam).

 In the present case, defendant alleged that the trial justice erred when he admitted the statements that his coconspirator Tretton made to Casala and King after the murder. We have viewed testimony as reliable when "the witness [here Casala] had been subjected to extensive cross-examination and the out-of-court declarant [here Tretton] had no reason to lie under the circumstances." *Bracero*, 434 A.2d at 289 (citing *State v. Patriarca*, 112 R.I. 14, 43–44, 308 A.2d 300, 318 (1973)). In addition, we have established three considerations to determine the trustworthiness of declarations made against one's penal interest under Rule 804(b)(3): "first, the timing of the declaration and the party to whom the declaration was made; second, the existence of corroborating evidence; and third, the extent to which the statement is truly against the declarant's penal interest." *State v. Firth*, 708 A.2d 526, 531 (R.I.1998).

In the present case, the contested statements, during and after the conspiracy, were clearly against Tretton's penal interest. His statements detailing the attack on Bailey were essentially self-inculpatory, rendering them inherently trustworthy, and were made in confidence to his girlfriend after the murder. Considerable corroborating evidence also linked him to the crime. In view of these indicia of reliability, the trial justice properly admitted the statements Tretton made to King and Casala. Moreover, defendant's own statements and actions provided overwhelming inculpatory evidence against his penal interest. Taking the stand at his trial, defendant strongly attempted to deny knowledge of the actual events on the night of Bailey's murder and place responsibility on his coconspirator Tretton and his friend King. While mostly offering testimony that contradicted statements by other witnesses and his own previous statements to the police, defendant admitted knowing that Tretton may have intended to harm someone and that the person might have been Bailey. The defendant also recounted, consistent with other supporting testimony, that he had given Tretton a ride home after the attack had occurred and had immediately noticed blood on Tretton. His own testimony placed him at 60 Curson St. on the evening of the murder and at the time stated by other witnesses. His description of his knife that was allegedly used in the attack was identical to the description by another witness, and he conceded that he may have sharpened it on that evening. He also admitted learning details of Bailey's murder that same evening, not calling the police, but going to bed, and on the following day, attempting to sell his car to four different people. In light of this inculpatory testimony and Casala's testimony relating defendant's statements against self-interest, had Tretton's statements been inadmissible hearsay, their admission would have been harmless error. *McKone*, 673 A.2d at 1075 (holding that the admission of hearsay constituted harmless error when "most of the challenged hearsay was in fact otherwise supported by other direct or indirect evidence in the record"). Here, we are convinced that the effect of this challenged testimony would have been negligible, given defendant's own admissions and the overwhelming physical evidence in this case. Taking into account any alleged error in the admission of hearsay statements, we are of the opinion that in light of *Williamson*, any possible errors were harmless beyond a reasonable doubt.

### Motion for Mistrial

 The defendant also contended that the trial justice's refusal to pass the case was reversible error. "[I]t is well-settled law that motions to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Figueroa*, 673 A.2d 1084, 1091

(R.I.1996); *State v. Martellini*, 533 A.2d 527, 529 (R.I.1987). We accord the trial justice's determination great deference because "he or she possesses 'a "front-row seat" at the trial and can best determine the effect of the improvident remarks upon the jury.'" *Figueroa*, 673 A.2d at 1091 (quoting *State v. Tempest*, 651 A.2d 1198, 1207 (R.I.1995)). Such a decision will be given great weight, and only in the event that the decision is clearly wrong will it be disturbed. *Id.; see also State v. Kryla*, 742 A.2d 1178, 1186 (R.I.1999). "When a party moves to pass the case, the trial justice must assess the prejudicial impact of the statements." *State v. Toole*, 640 A.2d 965, 974 (R.I.1994) (citing *State v. Usenia*, 599 A.2d 1026, 1032 (R.I.1991)). In considering a motion for mistrial, the trial justice should determine whether "the evidence was of such a nature as to cause the jurors to become so inflamed that their attention was distracted from the issues submitted to them." *State v. Brown*, 619 A.2d 828, 831 (R.I.1993). Even a prejudicial remark, however, does not require the granting of a motion to pass. *Toole*, 640 A.2d at 974 (citing *Usenia*, 599 A.2d at 1032).

In the present case, defendant made the motion to pass after Casala testified that Tretton received a phone call, after which Tretton told her they had to go, "Chico (defendant's nickname) wanted [them]." In his appeal, defendant alleged that the admission of this testimony violated his Sixth Amendment rights, because Tretton had refused to testify at defendant's trial and therefore was not available for cross-examination. Although the objection to Tretton's statements to Casala was a general, not a specific one, assuming without deciding that the issue was preserved for proper review, we believe that the issue now raised on appeal is without merit. The transcript reveals the following interchange at trial:

"Q: When Tretton got off the phone, what happened?

"A: He said—

"[Defense Counsel]: Objection.

"The Court: She may answer.

"A: He said we have to go. Chico wanted us.

"[Defense Counsel]: Move to pass, your Honor.

"The Court: What?

"[Defense Counsel]: I move to pass.

"The Court: Motion denied.

"[Defense Counsel]: Move to strike.

"The Court: Motion denied."

On the basis of this exchange, we conclude that the reference to "Chico" was not sufficiently inflammatory to distract the jury from the overwhelming evidence that defendant was directing Tretton's actions on that evening. In fact, the jury had not been informed that "Chico" was defendant's nickname, and both before and after this particular statement by Casala, the jury heard significant other testimony from which it could reasonably conclude that Tretton was acting on defendant's behest. Consequently, we conclude that the trial justice did not abuse his discretion by denying defendant's motion to pass the case.

## Instructions to the Jury

On appeal, defendant challenged the sufficiency of the trial justice's instructions on statements made in furtherance of a conspiracy. We first note that this issue has been waived by defendant's failure to object after the trial justice charged the jury. Pursuant to Rule 30 of the Superior Court Rules of Criminal Procedure,

"[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection."

We have repeatedly held that failure to object to a jury instruction precludes review of the instruction on appeal. *State v. Bertoldi*, 495 A.2d 247, 250 (R.I.1985). In

the present case, defendant failed to make a timely and specific objection when the trial justice omitted from the jury charge a specific instruction that defendant desired. Nevertheless, if a timely objection had been made, and we were to review the issue substantively, we would conclude that the trial justice instructed the jury correctly and sufficiently on the law of conspiracy and on the state's burden of proof. In his appeal, defendant claimed that the trial justice failed to instruct that the jury had to be satisfied beyond a reasonable doubt that a conspiracy existed before it could consider statements made in furtherance of such a conspiracy.

This Court has held that:

"[t]he charge given by a trial justice need only 'adequately cover [ ] the law.' [State v.] Grundy, 582 A.2d [1166,] 1170 [ (R.I.1990) ]. A trial justice's jury instructions will be upheld if they neither reduce nor shift the state's burden of proof. State v. Gordon, 508 A.2d 1339, 1349 (R.I.1986). On review, we examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them. State v. Gomes, 604 A.2d 1249, 1256 (R.I.1992). 'We will not examine single sentences. Rather, the challenged portions must be examined in the context in which they were rendered.' Gordon, 508 A.2d at 1349." State v. Marini, 638 A.2d 507, 517 (R.I. 1994).

In instructing the jury in the present case, the trial justice explained that defendant was charged with conspiracy, and he defined conspiracy for the jury as follows: "[A] conspiracy is a combination of two or more persons to commit an unlawful act. A conspiracy is, in effect, a partnership in a criminal venture. Once the unlawful agreement has been made, the crime of conspiracy is complete." The trial justice continued by stating the requisite burden of proof: "In order to convict the defendant of the charge of conspiracy, the State must prove beyond a reasonable doubt that on or about the dates alleged, there was an unlawful agreement between defendant Pacheco and Jonathan Tretton to commit murder." Finally, he detailed the law of vicarious responsibility as it relates to the crime of conspiracy. It is our conclusion that the trial court's instructions sufficiently covered the applicable law.

## Collateral Estoppel

On appeal, defendant argued that collateral estoppel precluded the state from seeking a term of life imprisonment without the possibility of parole, once the jury in defendant's coconspirator's case had not made a finding of aggravating circumstances. This Court has previously held that "[t]he doctrine of collateral estoppel makes conclusive in a later action on a different claim the determination of issues that were actually litigated in a prior action." E.W. Audet & Sons, Inc. v. Fireman's Fund Insurance Co. of Newark New Jersey, 635 A.2d 1181, 1186 (R.I. 1994); see also State v. Chase, 588 A.2d 120, 122 (R.I.1991). In order to invoke successfully the doctrine of collateral estoppel, a plaintiff must show "(1) that there [was] an identity of issues, (2) that the prior proceeding resulted in a final judgment on the merits, and (3) that the party against whom collateral estoppel is asserted [was] the same as or in privity with a party in the prior proceeding." E.W. Audet & Sons, Inc., 635 A.2d at 1186. The defendant's theory of collateral estoppel that would preclude a jury at his trial from finding aggravating circumstances cannot satisfy the requirement of identity of the parties. Although the state was a party to each of the proceedings against Tretton and against defendant—necessitated by the granting of defendant's motion for severance of their trials—Tretton and defendant were distinct and separate parties. In his appeal, defendant argued that he and Tretton were in privity because they faced the same charges by the state. It may be true that Tretton and defendant shared the same interest in defeating the charges against them, but their

mutuality of interest ended there. During his trial, defendant actually denied the existence of a conspiracy and implicated Tretton as the sole perpetrator, thereby demonstrating that their interests were opposed to each other. Tretton was convicted by a different jury that heard different testimony and evidence, and a different judge presided over each trial. Not unreasonably then, the Tretton jury could well have found that defendant Tretton's motivation and intent in killing the victim differed from those of defendant Pacheco. Additionally, in defendant's trial, the state carried and met the required burden of proving to the jury beyond a reasonable doubt that any aggravating circumstances were present. Therefore defendant was not prejudiced by the trial justice's allowing the jury to find aggravating circumstances.

### Propriety of the Sentence Imposed

■ Following the denial of his motion for a new trial, defendant applied to this Court for reduction of his sentence pursuant to § 12–19.2–5, which allows for a direct appeal in cases in which a life sentence without the possibility of parole has been imposed:

> "The defendant shall have the right to appeal a sentence of life imprisonment without parole to the supreme court of the state in accordance with the applicable rules of court. In considering an appeal of such a sentence, the court, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

■ In his appeal, defendant alleged that the trial justice erred when he charged the jury on the aggravating factor of murder for hire. The defendant also maintained that because the record did not reveal any evidence that torture or abuse of the victim was the purpose of the con-spiracy, the jury was mistaken in making such a finding.

In cases in which a sentence of life imprisonment without the possibility of parole has been imposed, we have held that it is incumbent upon this Court to exercise independent judgment and discretion in deciding the appropriateness of the sentence. *State v. Tassone,* 749 A.2d 1112, 1119 (R.I.2000) (citing *State v. Travis,* 568 A.2d 316, 322 (R.I.1990); *State v. Lassor,* 555 A.2d 339, 355 (R.I.1989)). In so doing, we examine the total record, consider the findings of the trial justice, and review the personal character, record, and propensities of the defendant. *Tassone,* 749 A.2d at 1119 (citing *State v. Wilson,* 568 A.2d 764, 769 (R.I.1990)).

The penalties for murder enumerated in § 11–23–2 provide in pertinent part that: "Every person guilty of murder in the first degree * * * (3) committed at the direction of another in return for money or any other thing of monetary value from that person; *or (4) committed in a manner involving torture or an aggravated battery to the victim* * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 such person shall not be eligible for parole from imprisonment." (Emphasis added.)

■ In *Travis,* we stated that the imposition of any sentence has historically been the function of the trial justice. *Travis,* 568 A.2d at 323. After the jury has found at least one aggravating circumstance enumerated in § 11–23–2, the trial justice may impose a sentence of life imprisonment without parole. *Id.* In this case, after the jury found defendant guilty of first-degree murder and conspiracy to commit murder, the trial justice instructed the jury to determine whether the murder involved aggravated battery or torture or both. He explained aggravated battery and torture to the jury as follows: "In the context of this case, the term aggravated battery is the malicious causing of bodily harm to the victim before her death by

seriously disfiguring her body or a member thereof. Torture requires evidence of serious physical or mental abuse of the victim while she remained alive and conscious." The trial justice also informed the jury of the state's claim "that Jonathan Tretton murdered Jenny Lee Bailey at defendant Pacheco's direction and in return for killing her, Tretton would receive, from defendant Pacheco, money or any other thing of monetary value."

In his appeal, defendant sought a reduction in his life-without-parole sentence, arguing that the trial justice committed reversible error by charging the jury on the "murder for hire" aggravating factor under § 11–23–2, an issue that defendant did not raise at trial but has presented for the first time on appeal to this Court. The defendant conceded in his brief, that "no objection was made to the trial justice's charge [that the jury must determine] 'whether or not [Bailey's] murder was committed by Mr. Tretton at Mr. Pacheco's direction in return for money or any other thing of monetary value from Mr. Pacheco.'" Following the trial justice's charge to the jury, both sides were given an opportunity to address the jury before it deliberated on aggravating factors, and defendant rephrased the issue for the jury as: "[The issues are] [f]irst, whether Mr. Tretton committed this murder in expectation for return of something of monetary value." On appeal, defendant argued that only his coconspirator committed murder for hire, given that he himself was not present at the scene. In addition, he claimed, the "murder for hire" factor of § 11–23–2 is applicable only to the individual who commits murder at the direction of another and not the person who procures such a deed.

Here, the jury determined unanimously that in addition to murder for hire, "aggravated battery" and "torture" were factors present in the murder. In *Travis*, we considered those terms to be of common usage and defined "battery" as conveying to a juror of ordinary intelligence "an im-

age of a beating or infliction of traumatic force that is greater than necessary in order to render a victim helpless or subject the victim to the will of the aggressor." Similarly, torture would convey a meaning of "inflicting pain and traumatic force beyond that which would ordinarily be expected even in the case of homicide." *Travis*, 568 A.2d at 323. The defendant suggested that the violence in *Travis* made it one of the "core cases" in which the harshest penalty possible should be imposed and from which the present case should be distinguished. In our independent judgment, we believe that the murder in the instant case was committed in a manner that supports the jury's finding of aggravated battery and torture. Numerous injuries were inflicted upon Bailey. *See post.* The evidence showed that she fell to the ground after a blow to her head with a metal bar; she was hit again and then was stabbed and cut repeatedly while she was still conscious. Given these circumstances, the state met its burden of proof of demonstrating torture or aggravated battery sufficient to support a sentence of life without parole under § 11–23–2. *State v. Smith*, 602 A.2d 931, 936 (R.I. 1992).

"Pursuant to § 12–19.2–1, the jury must find at least one aggravating factor in order to trigger the presentence hearing by the trial justice." *State v. Washington*, 581 A.2d 1031, 1035 (R.I.1990). "After hearing arguments and receiving evidence by both counsel, the trial justice then uses his or her own discretion to sentence defendant." *Id.* The penalties for murder listed in § 11–23–2 are enumerated in the alternative, thereby requiring that the jury find only one of seven conditions in order to trigger consideration of the "not eligible for parole" provision. Therefore, regardless of whether § 11–23–2(3) is interpreted to apply to the person who arranged for a killing or only to the person who actually executed it, a jury's finding that aggravated battery or torture was present under § 11–23–2(4) is sufficient to authorize a

judge to impose a sentence of life imprisonment without the possibility of parole.

This case is not the first in which we have reviewed the imposition of different sentences upon coconspirators. In *State v. McMaugh*, 672 A.2d 877, 878–79 (R.I.1996) (per curiam), we affirmed a more severe sentence for a coconspirator on the basis that the defendant was "the prime mover in the conspiracy," a rationale that would clearly support our holding here. Similar reasoning supported our affirming the disparate sentences for coconspirators in *State v. Ballard*, 699 A.2d 14, 17 (R.I.1997), where we held that the defendant in that case "was the mastermind of the kidnapping scheme," a role analogous to that of defendant here who was clearly the mastermind and prime mover of Bailey's murder. Moreover, we have explained that "only when the record unswervingly points to the conclusion that there is no 'justification' for the imposition of a sentence that is 'grossly disparate from sentences generally imposed for similar offenses' " shall we modify or revise a sentence imposed in the exercise of a trial justice's discretion. *State v. Crescenzo*, 114 R.I. 242, 263, 332 A.2d 421, 433 (1975).

After defendant's motion for new trial had been denied, a sentencing hearing took place at which Bailey's mother addressed the court, as did counsel for both parties. The trial justice also considered letters from decedent's aunt, an extensive letter by a friend of decedent, and the presentence report. During the imposition of the sentence, the trial justice explained why defendant should receive a sentence that exceeded the sentence received by his coconspirator and concluded that defendant should suffer the most extreme penalty allowed by law:

> "Pacheco was the one who conceived the plan to kill Jenny Lee Bailey. It was Pacheco, not Tretton, who truly was motivated by some perverse, angry reasons to have her killed. It was Pacheco, not Tretton, who planned the action that night, and it was Pacheco, not Tretton,

who directed that the scheme be carried out. It was Pacheco who lured Jenny Lee Bailey to the pond that night under the false guise of meeting her so that he could continue to be her friend and assist her financially with the expenses of the baby which, at the time, he assumed was his. Pacheco was the one who prompted and conscripted Tretton to kill Jenny Lee Bailey with inducements of money, a job, and a car. Tretton had no such murderous designs on Jenny Lee Bailey. But for Pacheco this killing would never have occurred that night."

In his appeal, defendant argued that the record did not reveal any evidence that torture or abuse of the victim was the objective of either defendant or the conspiracy, and therefore the jury erred in so finding. He also argued that a sentence of life imprisonment is adequate and proportional to his role in the crime. We disagree. The record in this case discloses ample evidence of cruelty and brutality. After being lured by defendant to a meeting, Bailey was unexpectedly attacked by defendant's coconspirator, who hit her in the back of her head with a metal window weight, causing her to fall on the ground. She did not lose consciousness after he hit her the first time, but was aware enough to ask Tretton why he was doing this to her. After Tretton responded that "he had to," he viciously assaulted Bailey, inflicting as many as sixteen knife wounds, including three stab wounds and five cuts to her throat and neck area, five stab wounds to her chest, and three stab wounds to her back. In the course of the attack, she sustained injuries to her lung, liver, kidney and heart. None of these injuries, however, was immediately fatal; instead, Bailey died only after her hemorrhaging depleted the blood supply to her brain. The testimony of the state medical examiner indicated that Bailey was probably conscious for at least part of the horrific attack. The fact that Bailey was pregnant at the time of her death was known to her attacker and to defendant when they

conspired to murder her. The evidence clearly supports the finding that the murder was committed in a manner involving torture or aggravated battery to the victim.

Referring to mitigating circumstances, defendant cites his youth,—nineteen years of age in 1995—his "mild history of trouble with the law," and the lack of evidence "to imply that John Pacheco had encouraged the torture or battery of the intended victim ." Having reviewed the presentence report and examined the record, we are not persuaded by defendant's arguments. The defendant had the benefit of a caring, intact family throughout his life, but his behavior displayed an avoidance of responsibility. While continuing a relationship with the mother of his son, defendant also pursued a sexual relationship with Bailey. When Bailey's pregnancy became threatening, defendant conspired to kill her and lured her to her death, after first arming his coconspirator with a metal bar and a knife that defendant himself had sharpened.

Therefore, after carefully considering the evidence in the exercise of our independent judgment and discretion, we affirm the sentence imposed by the trial justice.

### Conclusion

For the reasons stated herein, the defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed. The imposition of the sentence of life imprisonment without parole is affirmed, and the papers in this case may be remanded to Superior Court.

Justice FLANDERS did not attend oral argument but participated on the basis of the briefs.

WEISBERGER, Chief Justice concurring in part and dissenting in part with whom Justice GOLDBERG joins.

I concur fully in the opinion written by Justice Lederberg in all respects save that portion of the opinion which affirmed the propriety of the sentence imposed. For the following reasons I must dissent in respect to the imposition of the sentence of life imprisonment without parole.

The evidence in this case overwhelmingly supported the conclusion that the defendant, John R. Pacheco, Jr., procured the services of Jonathan Tretton to murder Jennifer Lee Bailey. The evidence also established beyond a reasonable doubt that Tretton committed the murder in a manner "involving torture or an aggravated battery to the victim" as required by G.L.1956 § 11–23–2(4).

There was no evidence to establish that this defendant participated in the acts of torture or aggravated battery since he was not at the scene of the crime.

There is no question that he should be punished as a principal for the act of first-degree murder because he participated in the premeditation and the conspiracy to commit the act of murder.

As is pointed out in the majority opinion, Jonathan Tretton in a separate trial was sentenced to life imprisonment, but was not subjected to the penalty of life imprisonment without parole. I agree with the majority that the State was not collaterally estopped from seeking in the case at bar this ultimate penalty solely by reason of the fact that the codefendant was not subjected to the same penalty.

Nevertheless, I am of the opinion that unwarranted disparity between sentences imposed upon codefendants should be avoided. Moreover, in the case at bar, I have serious doubts concerning whether this defendant meets the requirements for this extreme penalty under the provisions of § 11–23–2, which provides in pertinent part that:

"Every person guilty of murder in the first degree * * * (3) committed at the direction of another person in return for money or any other thing of monetary value from that person; or (4) committed in a manner involving torture or an

aggravated battery to the victim * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 such person shall not be eligible for parole from imprisonment."

First, it is clear that Tretton committed the murder at the direction of Pacheco for money. The defendant did not plan the murder at the direction of any other person for money or any other thing of monetary value. Consequently, he is ineligible for that finding of an aggravating circumstance. It is true, as the majority points out, that the trial justice instructed the jury that this defendant was eligible for such a finding. I believe that charge was erroneous, but also recognize that counsel for defendant failed to object to the instruction.

However, on an appeal from a sentence this Court pursuant to G.L.1956 § 12–19.2–5 reviews the imposition of the sentence *de novo* and is not bound by the findings of the jury or the trial justice as to the imposition of this extreme penalty. Life imprisonment without parole is Rhode Island's equivalent of the death penalty. Because of the grave severity of the punishment, the Legislature has given the defendant upon whom such a sentence is imposed the right to appeal the sentence to this Court and has given this Court complete discretion to ratify or reduce the sentence to life imprisonment. This is not a situation in which we review deferentially the imposition of a sentence by the trial court. We exercise our judgment *de novo*. This means that we review both the facts and the law to determine whether the sentence is appropriate.

In reviewing both the facts and the law, I am of the opinion that this defendant did not meet the requirements of § 11–23–2(3) in that he did not commit the crime for money at the direction of another person. I am further of the opinion that he did not participate in or command the torture and aggravated battery to the victim that was certainly committed by Tretton.

This defendant planned a heinous crime. He is certainly guilty of murder in the first degree. I believe that he deserves the mandatory penalty of life imprisonment. Nevertheless, I am bound by the provisions of the statute and cannot rely upon an erroneous charge to the jury (even though without objection) or upon erroneous findings of the trial justice. In the exercise of my independent judgment reviewing the facts and the law *de novo*, I am constrained to conclude that this defendant should not be sentenced to life imprisonment without parole, but should be sentenced to life imprisonment, the mandatory penalty for murder in the first degree in the absence of proof of the aggravating statutory circumstances.